In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3208

HERAND ABCARIAN,

*Plaintiff-Appellant*,

*v.*

TIMOTHY MCDONALD, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CV 3843—**Samuel Der-Yeghiayan**, *Judge*.

ARGUED APRIL 22, 2010—DECIDED AUGUST 13, 2010

Before KANNE, WILLIAMS, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge.* After learning that the settlement of a medical malpractice claim against him had been reported to state and national professional authorities, Dr. Herand Abcarian filed this suit against the University of Illinois and a number of its employees alleging numerous violations of his constitutional rights. The district court dismissed the amended complaint in its entirety and entered a judgment dismissing the case.

Abcarian then moved the district court to reconsider its ruling and allow him to amend his complaint again, but the district court denied that motion.

We affirm in all respects. Abcarian's own complaint shows that the defendants merely complied with legal requirements for filing notices of medical malpractice settlements with federal and state authorities. By filing those notices, the defendants did not violate Abcarian's free speech rights or his rights to equal protection of the law and due process of law.

*Plaintiff's Allegations*

Because the district court granted the defendants' Rule 12(b)(6) motion to dismiss, we take the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in Abcarian's favor from those allegations. *London v. RBS Citizens, N.A.*, 600 F.3d 742, 745 (7th Cir. 2010). Where those allegations are contradicted by written exhibits that Abcarian attached to his amended complaint, however, the exhibits trump the allegations. See *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998). We review de novo the district court's grant of a motion to dismiss for failure to state a claim. *United States v. Lewis*, 411 F.3d 838, 841-42 (7th Cir. 2005), citing *Olson v. Wexford Clearing Servs. Corp.*, 397 F.3d 488, 490 (7th Cir. 2005).

At all relevant times, Abcarian was Head of the Department of Surgery at the University of Illinois College of Medicine at Chicago and Service Chief of the Depart-

ment of Surgery of the University of Illinois Medical Center at Chicago. During his tenure, Abcarian and the individual defendants—who were all University employees—clashed over a number of issues including risk management, faculty recruitment, compensation and fringe benefits, other issues that Abcarian vaguely refers to as managerial obstruction of "numerous needed changes," and medical malpractice insurance premiums.

In 2005, Abcarian was notified that a lawsuit was being contemplated against him based on the death of John Behzad, a former patient. When the defendants learned of this potential lawsuit, says the complaint, they conspired together to use that suit to discredit Abcarian's reputation. As part of this alleged conspiracy, the University executed a settlement agreement with John Behzad's son David Behzad. The agreement released the University and its employees and agents (implicitly but undoubtedly including Abcarian) from any and all claims arising out of John Behzad's death in exchange for a payment of $950,000.[1]

---

[1] Abcarian alleges that there was no settlement on his behalf, but this allegation need not be taken as true because it is directly contradicted by the settlement agreement attached to his amended complaint. See *Northern Indiana Gun & Outdoor Shows*, 163 F.3d at 454. The fact that Abcarian was a third-party beneficiary to the settlement agreement rather than an actual signatory does not render the settlement a nullity. See, *e.g.*, *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 924 (Ill. App. 2009).

Abcarian alleges that the execution of this settlement agreement was the first step in a conspiracy to destroy his reputation and career. How could a settlement advance the conspirators' goal of discrediting Abcarian? Abcarian's answer to this question is that the defendants entered into the settlement agreement and paid Behzad nearly a million dollars merely so they could report the settlement of a medical malpractice claim against Abcarian to the Illinois Department of Financial and Professional Regulation ("IDFPR") and the National Practitioner Data Bank ("NPDB").[2] Upon receiving those reports, both the IDFPR and the NPDB asked Abcarian to provide information about the settlement.[3] The IDFPR told Abcarian that a failure to provide a timely response to its request could result in disciplinary action. Abcarian does not allege, however, that any formal disciplinary proceedings were ever initiated against him, let alone that any formal disciplinary sanctions were imposed.

---

[2] The NPDB is "an alert or flagging system" intended to assist state licensing boards and other entities conduct independent investigations into the qualifications of health care practitioners. U.S. Dep't of Health and Human Services, NPDB GUIDEBOOK, A-3, *available at* http://www.npdb-hipdb.hrsa.gov/pubs/gb/NPDB_Guidebook.pdf.

[3] Abcarian alleges that the reports were false because there was no settlement on his behalf. Again, because the settlement agreement attached to his complaint makes clear that a settlement was made on his behalf, we do not assume the truth of this allegation. See *Northern Indiana Gun & Outdoor Shows*, 163 F.3d at 454.

The alleged conspiracy to destroy Abcarian's professional reputation did not end with the reporting of the settlement, according to Abcarian. The same day that the settlement agreement was executed, the defendants directed David Behzad's counsel to file suit against Abcarian in a state trial court. They further directed Behzad's counsel not to serve Abcarian with process in that suit, but to inform the court that the matter had been settled and to request a dismissal of the lawsuit. Abcarian believes that the defendants did this to prevent him from contesting the merits of the malpractice claim.

The state trial court approved the settlement agreement and dismissed the case with prejudice. When Abcarian learned of the dismissal, he filed a petition to vacate the dismissal. He asked that the settlement be vacated and the settlement funds returned to the defendants. The defendants, through counsel, intervened to oppose this petition. The court vacated the dismissal order but declined to vacate the settlement agreement. Behzad then voluntarily dismissed his lawsuit with prejudice. The trial court's decision was affirmed on appeal, *Behzad v. Abcarian*, No. 1-07-1357 (Ill. App. May 19, 2008) (unpublished order), and the Illinois Supreme Court declined review, *Behzad v. Abcarian*, 897 N.E.2d 249 (Ill. 2008).[4]

---

[4] Abcarian's allegation in his amended complaint that the Illinois appellate court held that "no settlement of any such medical negligence lawsuit has been made" misrepresents that court's holding. Abcarian's briefs make similarly misleading assertions. The appellate court noted that Abcarian "was not

(continued...)

Abcarian then brought this lawsuit against the defen-
dants alleging various constitutional claims under 42
U.S.C. § 1983, as well as a number of state law claims. On
the defendants' motion to dismiss Abcarian's amended
complaint, the district court dismissed all claims against
the Board of Trustees of the University of Illinois on
Eleventh Amendment grounds and dismissed all of
Abcarian's constitutional claims against the individual
defendants for failure to state a claim on which relief
could be granted. *Abcarian v. McDonald*, No. 08 C 3843,
2009 WL 596575 (N.D. Ill. March 9, 2009). The district
court then declined to exercise supplemental jurisdic-
tion over the remaining state law claims and dismissed
them without prejudice. *Id.* at *9. Abcarian later asked
the court to amend its judgment and to allow him to
amend his complaint again, but the court denied both
requests. *Abcarian v. McDonald*, No. 08 C 3843, 2009 WL
2448044 (N.D. Ill. Aug. 10, 2009).

Abcarian appeals the district court's dismissal of his
free speech, equal protection, and procedural due process
claims against the individual defendants. He also chal-
lenges the court's refusal to amend its judgment under
Federal Rule of Civil Procedure 59(e) and argues that

---

[4] (...continued)
a party to the settlement," but it rejected Abcarian's challenge
to the order approving that settlement and never addressed
the validity of the settlement itself. *Behzad*, No. 1-07-1357, slip
op. at 5-6. The Illinois court similarly found that Abcarian's
briefs did not "convey a complete picture of the facts," in
violation of state court rules. *Id.* at 6.

the court should have permitted him to amend his complaint. He does not appeal the dismissal of his claims against the Board of Trustees or the dismissal of his substantive due process and jury trial claims.

*Analysis*

I. *Dismissal on the Merits*

   A. *First Amendment Retaliation Claim*

In Count I of his amended complaint, Abcarian claimed that the defendants violated his First Amendment rights by retaliating against him for exercising his freedom of speech. The district court concluded that the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), foreclosed this claim because all of the speech that prompted the alleged retaliation was speech in the course of Abcarian's official duties as a public employee.

On appeal, Abcarian's makes two arguments to avoid the effect of *Garcetti*. First, he argues that *Garcetti* forbids retaliation claims only against employers themselves, not against fellow employees. This is an issue on which we reserved judgment in *Fairley v. Andrews*, 578 F.3d 518, 524 (7th Cir. 2009). Second, he argues that even if *Garcetti* reaches retaliation claims against other employees, it does not foreclose his claim because his speech did not "owe[ ] its existence" to his professional responsibilities. See 547 U.S. at 421.

*Garcetti* held that "when public employees make statements pursuant to their official duties, the employees

are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* The case arose when a state prosecutor brought a First Amendment retaliation claim arising out of discipline imposed on him after he drafted a memorandum questioning the validity of a search warrant obtained in a pending criminal case. *Id.* at 413-15. The Supreme Court rejected his claim. Although the Court noted employers' heightened interest in controlling employee speech when necessary to manage workplace operations, it focused on the fact that restricting speech made pursuant to employment duties "does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-23. As a result, the Court rejected "the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties." *Id.* at 426.

Plaintiff Abcarian seeks to narrow *Garcetti* to apply only to claims against the employer as an entity, while still allowing claims against individual co-employees who acted as agents of the employer. We are not persuaded. It would be difficult to reconcile *Garcetti* with a broad rule permitting retaliation claims against co-employees in all circumstances. Although the Supreme Court couched its analysis in the context of the employer-employee relationship, it indicated that employees speaking pursuant to their official duties do not speak as citizens for purposes of the First Amendment. *Id.* at 421. For this reason, we have read *Garcetti* broadly. See, *e.g.*, *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) ("*Garcetti*

made clear that public employees speaking 'pursuant to their official duties' are speaking as employees, not citizens, and thus are not protected by the First Amendment regardless of the content of their speech.").

In *Fairley*, on which Abcarian primarily relies, the plaintiffs brought First Amendment retaliation claims against both their employer and their co-employees. 578 F.3d at 520-21. Although we questioned the applicability of *Garcetti* to all acts of non-employers, we observed that the co-employee defendants in *Fairley* were "merely enforcing [the employer's] policy." 578 F.3d at 524. Because their actions were allegedly condoned by their employer, who was himself immune from liability under *Garcetti*, we held that the co-employee defendants were also immune from liability. We explained this conclusion by noting the significant difference between co-employees who "try to subvert the employer's policies" and co-employees who merely "enforce" the employer's policies. *Id.* Applying this distinction, we reinstated claims against co-employees who allegedly bullied and threatened the plaintiffs to deter them from testifying against other employees in a civil rights lawsuit. We reasoned that the duty to provide testimony is better understood for these purposes not as a job duty, something done for the benefit of the employer, but as a duty that any person owes to the court, something done for the rule of law. *Id.* at 524-25.

In essence, *Fairley* held that the reasoning of *Garcetti* reaches claims against employers and also claims against co-employees whose actions directly advance the em-

ployer's interest in maintaining an orderly workplace. This would apply when the co-employee acts under instructions from, with express approval of, or in clear accordance with the policies set out by the employer itself. In such circumstances, the co-employee's actions implicate the employer's administrative interests so squarely as to require application of *Garcetti* for the benefit of the co-employee. Suppose, for example, that the prosecutor in *Garcetti* had been reported (in compliance with the employer's written policies) by a co-worker for his behavior and had been disciplined then. Under Abcarian's proposed narrow interpretation of *Garcetti*, the employer would be immune from a retaliation claim but the co-worker would not, despite the fact that he acted only to further the employer's interests. Such a rule would be at least as disruptive to workplace discipline as would a rule allowing retaliation suits against the employer itself—exactly contrary to *Garcetti*. Although employers could still respond to workplace complaints without fear of suit, we could expect that complaints would be made less frequently because of the other employees' fear of being sued by their co-workers. Less able to rely on its own employees to provide necessary information on which to base its disciplinary decisions, the employer would be in practically the same position, from a managerial standpoint, that it would have occupied if *Garcetti* had been decided the other way.

Accordingly, we reject Abcarian's first argument and conclude that *Garcetti* applies to the retaliation claim against the individual defendants. Abcarian specifically

alleged that the Board of Trustees "adopt[ed] and ratif[ied] the actions of the conspirators as [its] official policy," forcing a conclusion that the defendants' alleged retaliatory acts advanced the Board's interests as an employer. Because *Fairley* made clear that *Garcetti* shelters employee actions in this situation, we need not decide the broader question whether *Garcetti* applies to all instances of co-employee retaliation.

Abcarian's second argument against application of *Garcetti* is that his speech was not pursuant to his official responsibilities. *Garcetti* bars retaliation claims only if the plaintiff spoke as an employee rather than as a citizen. See *Chacklos v. Stevens*, 560 F.3d 705, 711-12 (7th Cir. 2009) ("*Garcetti* requires a threshold determination regarding whether the public employee spoke in his capacity as a private citizen or as an employee."), citing *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2009). When determining whether a plaintiff spoke as an employee or as a citizen, we take a practical view of the facts alleged in the complaint, looking to the employee's level of responsibility and the context in which the statements were made. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008).

A natural reading of the allegations in Abcarian's amended complaint indicates that he spoke while discharging the responsibilities of his office, not as a member of the general public. Abcarian was not merely a staff physician with limited authority. He was, among other things, the Service Chief of the Department of Surgery at the University of Illinois Medical Center at

Chicago as well as Head of the Department of Surgery at the University of Illinois College of Medicine at Chicago. Abcarian had significant authority and responsibility over a wide range of issues affecting the surgical departments at both institutions and therefore had a broader responsibility to speak in the course of his employment obligations. The subjects on which he spoke—risk management, the fees charged to physicians, and surgeon abuse of prescription medications, among other things—directly affected both surgical departments and fell within the broad ambit of his responsibilities. This alleged speech was within the scope of Abcarian's responsibilities as an employee. See *id.* ("An employee with significant and comprehensive responsibility . . . certainly has greater responsibility to speak . . . .").

Abcarian's amended complaint gives us insufficient reason to believe that, despite the likelihood that he spoke in the course of his job responsibilities, he ever stepped outside his administrative role to speak as a citizen. On appeal, Abcarian admits that his amended complaint is "entirely devoid of any job description or other detail of Abcarian's affirmative duties," leaving us to speculate whether he spoke as a citizen or in the course of his employment. A mere speculative possibility that Abcarian spoke as a citizen is no longer enough to satisfy federal notice pleading requirements. See *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 804 (7th Cir. 2008); *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773,

776, 781 (7th Cir. 2007). Nor are Abcarian's conclusory allegations that he spoke as a citizen on matters of public concern. See *Tamayo*, 526 F.3d at 1092 (stating that a plaintiff cannot "escape the strictures of *Garcetti*" by asserting a legal conclusion that he spoke as a citizen outside the duties of his employment). The amended complaint fails to show that it is at all plausible, rather than perhaps theoretically possible, that Abcarian spoke in his capacity as a citizen when he spoke with other University employees about University affairs relevant to his job duties. See *Iqbal*, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").[5]

Because any plausible reading of Abcarian's amended complaint indicates that his speech was made pursuant to his official duties, and because Abcarian failed to make any factual allegations indicating otherwise, *Garcetti* bars his First Amendment retaliation claim. Dismissal of Count I of the amended complaint was proper.

---

[5] We also reject Abcarian's unsupported assertion that his speech could be considered "expression related to academic scholarship or classroom instruction" possibly exempt from *Garcetti*. See 547 U.S. at 425. Abcarian's speech involved administrative policies that were much more prosaic than would be covered by principles of academic freedom.

B.  *Equal Protection Class-of-One Claim*

The Equal Protection Clause of the Fourteenth Amend-
ment most typically reaches state action that treats a
person poorly because of the person's race or other
suspect classification, such as sex, national origin,
religion, political affiliation, among others, or because
the person has exercised a "fundamental right," or be-
cause the person is a member of a group that is the
target of irrational government discrimination. See gen-
erally *Engquist v. Oregon Dep't of Agriculture*, 553 U.S.
591, __, 128 S. Ct. 2146, 2152 (2008); *Plyler v. Doe*, 457
U.S. 202, 216-17 (1982); *Srail v. Village of Lisle*, 588 F.3d
940, 943 (7th Cir. 2009). The Supreme Court has also
recognized the prospect of a so-called "class-of-one" equal
protection claim. *Village of Willowbrook v. Olech*, 528 U.S.
562 (2000). A class-of-one claim need not allege discrim-
ination based on a suspect classification, but must allege
that the plaintiff was singled out arbitrarily, without
rational basis, for unfair treatment. *E.g.*, *Avila v. Pappas*,
591 F.3d 552, 554 (7th Cir. 2010); see generally *Srail*, 588
F.3d at 943 (summarizing Seventh Circuit's "divergent
class-of-one precedent" regarding whether illegitimate
animus can substitute for absence of rational basis for
state action).

Abcarian tries to take advantage of this theory in
Count VI of the amended complaint, which alleges
that defendants violated his equal protection rights by
reporting the Behzad settlement but not the settlement
of a malpractice claim against another physician. The
district court dismissed Count VI and the related claim

for equitable relief on the ground that Abcarian's claim was barred by the Supreme Court's decision in *Engquist*. Abcarian contends that *Engquist* applies only to class-of-one claims against governmental employers but not to claims against other government employees.

We conclude that the district court correctly dismissed the equal protection claim, but for another reason: under the law, defendants had no discretion in deciding whether to report the Behzad settlement. *Engquist* held that class-of-one claims cannot be based on the highly discretionary and individualized sorts of decisions that public employers must make about their employees. The Court pointed out that its decision in *Olech*, which first recognized class-of-one equal protection claims, rested on "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." 553 U.S. at ___, 128 S. Ct. at 2153. Some forms of state action "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 2154. "[A]llowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Id.* "It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." *Id.* Accordingly, the class-of-one theory of equal protection is a "poor fit" with employment decisions, which are themselves "often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at 2154-55. Based on this analysis, the Court held that "a 'class-of-one'

theory of equal protection has no place in the public employment context." *Id.* at 2148-49.

We have interpreted *Engquist* to stand for the broad proposition that inherently subjective discretionary governmental decisions may be immune from class-of-one claims. See, *e.g.*, *Avila*, 591 F.3d at 554 (noting in dicta that "class-of-one claims cannot rest on governmental activity that is discretionary by design"); *Srail*, 588 F.3d at 945 (rejecting class-of-one challenge to village's "subjective and individualized" decision not to extend water services); *United States v. Moore*, 543 F.3d 891, 898-99 (7th Cir. 2008) (stating that class-of-one challenges "may be inapplicable to any governmental action that is the product of a highly discretionary decision-making process").[6] We have also recognized that

---

[6] We do not read our cases to say, nor do we mean to imply, that *Engquist* precludes *all* class-of-one claims brought in regard to subjective governmental decisions no matter the context in which those decisions were rendered. After all, *Engquist* rested on two key premises, only one of which involved the subjectivity of employment decisions. See 128 S. Ct. at 2151 ("[T]he core concern of the Equal Protection Clause as a shield against arbitrary classifications, *combined with unique considerations applicable when the government acts as employer as opposed to sovereign*, lead us to conclude that the class-of-one theory of equal protection does not apply in the public employment context." (emphasis added)); *id.* at 2151-52 (explaining that, because the government has broader power when it acts as an employer, the validity of a constitu-

(continued...)

*Engquist* has limited applicability when a decision-maker's discretion is circumscribed by constitutional or statutory provisions. For example, because police discretion is narrowed by objective constitutional limitations such as the Fourth Amendment, not all discretionary police decision-making is immune from class-of-one challenge. See *Hanes v. Zurick*, 578 F.3d 491, 495 (7th Cir. 2009).

But when the law gives a state actor *no* discretion, it is hard to see how a person can claim irrational discrimination when the law is applied to him. State and federal law *required* the defendants to report the settlement of Behzad's malpractice claim to the relevant federal and state authorities—no matter however frivolous or insubstantial that claim may have been. See 42 U.S.C. § 11131(a) (requiring any entity making a payment in settlement of a medical malpractice claim to report certain information to the NPDB); 225 ILCS 60/23(A)(3) (requiring any entity which indemnifies a physician for his professional liability to report the settlement of a claim).[7]

---

[6] (...continued)
tional claim in the government employment context turns on "whether the asserted employee right implicates the basic concerns of the relevant constitutional provision.").

[7] The Illinois Supreme Court recently invalidated Public Act 94-677, which amended certain sections of 225 ILCS 60/23, on non-severability grounds. *Lebron v. Gottlieb Memorial Hosp.*, 2010 WL 375190 (Ill. Feb. 4, 2010). That decision restored the statute as it existed prior to the enactment of P.A. 94-677. See

(continued...)

Abcarian's complaint seeks to assert a claim of selective enforcement—the enforcement of a law against only disfavored individuals—a claim long familiar in equal protection jurisprudence when based on race, national origin, or other suspect classifications. See *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (reversing convictions because underlying ordinance was enforced solely against individuals of Chinese ancestry). Notably, such cases are typically brought against police, prosecutors, or other individuals having discretion in the enforcement of the law. See, *e.g.*, *Wayte v. United States*, 470 U.S. 598, 608 (1985) (challenge implicating prosecutorial discretion); *Yick Wo*, 118 U.S. at 366 (challenge to ordinance vesting discretion in decisionmaker so great as to be considered "naked and arbitrary power"). Equal protection claims are allowed in such circumstances not because the particular law at issue is facially invalid or inapplicable to the plaintiff's conduct, but because of the concern that individuals with discretion in law enforcement will take advantage of that discretion to oppress unpopular groups.[8]

---

[7] (...continued)
*Village of Chatham v. County of Sangamon*, 837 N.E.2d 29, 41 (Ill. 2005) (noting that invalidation of statutory amendment restores previous version of statute). The reporting requirement pre-dated the invalidated amendment, so it is still part of Illinois law.

[8] For example, the Joint Committee on Reconstruction recognized that discrimination against freed slaves and Union

(continued...)

But Abcarian's claim here has little in common with a typical selective enforcement claim. As we noted above, the defendants were *required* to report the settlement of Behzad's claim to the authorities. See 42 U.S.C. § 11131(a); 225 ILCS 60/23(A)(3). They had neither "naked and arbitrary" power, *Yick Wo*, 118 U.S. at 366, nor a broad discretion to act, *Wayte*, 470 U.S. at 608. Unlike a police officer or prosecutor having significant discretion as to how or whether to *enforce* the law, these defendants had no choice as to whether they *complied* with the law. If they disregarded their reporting obligations, they ran the risk of civil and criminal penalties—penalties certainly not at issue when a police officer chooses not to issue

---

[8] (...continued)

sympathizers was being effected not by facially discriminatory laws, but by the failure to enforce facially neutral laws in an even-handed way. See *McCleskey v. Kemp*, 481 U.S. 279, 346-47 & n.2 (1987) (Blackmun, J., dissenting); Keith S. Alexander, *Federalism, Abortion, and the Original Meaning of the Fourteenth Amendment Enforcement Power: Can Congress Ban Partial-Birth Abortion After Carhart?*, 13 Tex. Rev. L. & Pol. 105, 125-26 (2008); see also Michael J. Gerhardt, *The Ripple Effects of Slaughter-House: A Critique of a Negative Rights View of the Constitution*, 43 Vand. L. Rev. 409, 441 (1990) ("The framers of the fourteenth amendment understood from first-hand experience that the states could discriminate invidiously against the beneficiaries of Reconstruction, specifically blacks and those seeking enforcement of a wide variety of fundamental rights, through . . . the discriminatory enforcement of racially neutral laws . . . .").

a traffic ticket or when a prosecutor declines to press charges. See 42 U.S.C. § 11131(c) (imposing civil penalty of not more than $10,000 for a failure to report); 225 ILCS 60/23(G) (making a failure to report a misdemeanor). Absent any meaningful discretion on the defendants' part to decide whether to report the settlement of a particular malpractice claim, we see little risk of the kind of discriminatory action addressed by the Fourteenth Amendment. The district court was correct to dismiss Count VI of Abcarian's amended complaint and the related claim for equitable relief.

### C. *Procedural Due Process Claims*

Abcarian's last constitutional claim is that defendants violated his right to procedural due process by reporting the Behzad settlement to state and national authorities. He now challenges the district court's dismissal of Counts II and IV and his related request for equitable relief.

A procedural due process claim involves a two-step analysis: "First, we determine whether the defendants deprived the plaintiff of a protected liberty or property interest, and if so, then we assess what process was due." *Brokaw v. Mercer County*, 235 F.3d 1000, 1020 (7th Cir. 2000), citing *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996); see *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) (stating that deprivations of life, liberty, or property must be accompanied by notice and the opportunity for a hearing appropriate to the interest at is-

sue), quoting *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950).[9]

Abcarian claims that the defendants defamed him and thereby infringed his liberty to pursue his chosen occupation. The Supreme Court has made it clear that defamation alone, even by a state actor, does not violate the Due Process Clause of the Fourteenth Amendment. *Paul v. Davis*, 424 U.S. 693 (1976). To avoid constitutionalizing state defamation law, defamation by a government actor does not implicate the Due Process Clause unless "a right or status previously recognized by state law was distinctly altered or extinguished" as a result. *Id.* at 711; *Brown v. City of Michigan City*, 462 F.3d 720, 730 (7th Cir. 2006). To avoid this problem, a plaintiff must allege that "(1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001); *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991).

Abcarian's amended complaint shows that he cannot satisfy the third prong of this test. It is true that he has

---

[9] Abcarian claims that the defendants waived any argument regarding the existence of a protected interest by failing to raise that argument before the district court. This contention is absolutely without merit, given that the defendants devoted nearly a page of their Rule 12(b)(6) memorandum to that precise argument.

a protected liberty interest in pursuing his chosen profession, of course, but that right is not infringed by ordinary defamation or even by a serious deprivation of one's future employment prospects. *Dupuy v. Samuels*, 397 F.3d 493, 510 (7th Cir. 2005). To plead a constitutionally relevant tangible loss of his employment opportunities, Abcarian must allege that his "good name, reputation, honor or integrity [was] called into question in a manner that makes it virtually impossible for [him] to find new employment in his chosen field." *Townsend*, 256 F.3d at 670; *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 801 (7th Cir. 2000); *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997).

Abcarian cannot meet this burden for a simple and benign reason: he still has his job in his chosen profession! According to his amended complaint, he remains gainfully employed as a University of Illinois physician and professor. Although he allegedly fears that he will not be employed at *additional* health care institutions in the future, "[i]t is the liberty to pursue a *calling or occupation*, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992), citing *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1138 (7th Cir. 1984). One simply cannot have been denied his liberty to pursue a particular occupation when he admittedly continues to hold a job—the same job—in that very occupation.

We pause to clarify one additional point. We have been focusing on the absence of any infringement of a

liberty interest. The district court also addressed Abcarian's property interest theory. In addressing that theory, the district court erroneously concluded that our decision in *Fleury v. Clayton*, 847 F.2d 1229 (7th Cir. 1988), meant that the mere reporting of the settlement imposed a property deprivation. *Abcarian*, 2009 WL 596575, at *7. In *Fleury*, an Illinois physician had consented to a censure by state disciplinary authorities. 847 F.2d at 1230. He then sued to expunge the censure, alleging a deprivation of his right to procedural due process. On appeal, we reversed dismissal of his claim. We noted that Fleury had not been wholly excluded from his chosen profession and therefore had not been denied his liberty of occupational choice. Nevertheless, based on *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972), and its progeny, we concluded that the "criteria for professional discipline" found in Illinois statutes "creates a 'property' interest in a blemish-free license to practice medicine" because those criteria gave Fleury a "right to a particular decision reached by applying rules to facts." *Id.* at 1231-32. Absent the statute's "substantive criteria," however, he would have had no such property interest. *Id.* at 1232; see *Cain v. Larson*, 879 F.2d 1424, 1427 (7th Cir. 1989).

Read in context, the language in *Fleury* means only that an Illinois physician has a property interest in a medical license free from formal disciplinary sanction imposed without due process. A physician does not have a due process right to be exempt from the formal disciplinary processes themselves. In other words, the relevant "blemishes" are actual formal disciplinary sanc-

tions, not the use of formal processes to resolve mere llegations of unprofessional conduct. Key to our analysis in *Fleury* was the formality of disciplinary sanctions and their possible legal consequences, contrasted with the lesser, informal consequences of mere defamatory statements. *Id.* at 1232. This distinction was significant because the defendants were members of the state medical disciplinary board that had censured Fleury. Accordingly, the "blemish-free license" language in *Fleury* is limited to defendants actually able to impose formal disciplinary sanctions and bound by the relevant substantive decision-making criteria governing the imposition of such sanctions. Only such defendants may actually "blemish" a physician's medical license in a constitutionally relevant way.

Abcarian failed to allege a deprivation of the property interest in his medical license we recognized in *Fleury*. None of the defendants named in this suit had the ability to impose sanctions. They could only report Abcarian (or, actually, report the group settlement of the malpractice claim) to the authorities, as required by law. Standing alone, such a report has no formal effect on Abcarian's license to practice medicine. Even if we suppose that the report defamed him, which is a very long stretch, mere defamation is insufficient to create a constitutionally actionable "blemish." The district court did not err by dismissing Counts II and IV of the amended complaint and the related claim for equitable relief.

II. *The Rule 59(e) Motion and the Second Amended Complaint*

Abcarian also asserts that the district court should have granted his motion to amend or alter its judgment under Federal Rule of Civil Procedure 59(e). He argues in the alternative that he did not need to bring a Rule 59(e) motion before requesting leave to amend his complaint because the district court had dismissed only his amended complaint but never entered final judgment disposing of the entire civil action.

As to Abcarian's first argument, a Rule 59(e) motion will be granted only in the case of a manifest error of law or fact, or newly discovered evidence. *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Abcarian claims no newly-discovered evidence, and the district court committed no error of law calling its judgment into question, let alone any manifest error of law justifying relief under Rule 59(e).

As to his second argument, a plaintiff may amend his pleading once as a matter of course, but any additional amendments may be made only with the opposing party's consent or by leave of court. Fed. R. Civ. P. 15(a). If the plaintiff wants to amend his complaint following the entry of judgment, however, he may do so only after a motion under Rule 59(e) or 60(b) has been granted. *Sparrow v. Heller*, 116 F.3d 204, 205 (7th Cir. 1997), quoting *Figgie Int'l Inc. v. Miller*, 966 F.2d 1178, 1179 (7th Cir. 1992). Having failed to bring a successful motion under Rule 59(e), Abcarian can amend his complaint only if he is correct that no final judgment had been entered in this matter.

We have often held that the "simple dismissal of a complaint does not terminate the litigation." *E.g.*, *Benjamin v. United States*, 833 F.2d 669, 671 (7th Cir. 1987), citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1111 (7th Cir. 1984). Importantly, however, *Benjamin* itself addressed a specific situation in which the scope of the district court's order was unclear. See 833 F.2d at 671-72 (noting that the court used both the words "complaint" and "action"). If the district court clearly intended its order of dismissal to dispose of the entire action, not merely the complaint itself, there exists a final and appealable judgment and the *Benjamin* rule is inapplicable. *Rothner v. City of Chicago*, 929 F.2d 297, 300 (7th Cir. 1991).

Here, the district court's intent was obvious. When the court granted the defendants' motion to dismiss, a separate entry was immediately made in the court docket on Form AO 450, the form specifically used for entry of a separate final judgment under Rule 58. See *Martinez v. City of Chicago*, 499 F.3d 721, 724 (7th Cir. 2007). In denying Abcarian's Rule 59(e) motion, the court stated that its previous order meant to make "abundantly clear" that the court "dismissed the *action, not the amended complaint*." *Abcarian*, 2009 WL 2448044, at *2 (emphasis added). A court's interpretation of its own orders can be rejected for an abuse of discretion, *In re Chicago, Rock Island & Pac. R.R. Co.*, 860 F.2d 267, 272 (7th Cir. 1988), but Abcarian draws our attention to nothing in the record that would persuade us not to take the district court at its word. Final judgment was entered in this matter before Abcarian attempted to

amend his complaint a second time. Accordingly, the district court did not err when it denied Abcarian leave to file his second amended complaint. *Sparrow*, 116 F.3d at 205.

The judgment of the district court is AFFIRMED.