In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3361

CHICAGO UNITED INDUSTRIES, LTD., *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 5011—**Robert M. Dow, Jr.**, *Judge*.

ARGUED NOVEMBER 29, 2011—DECIDED JANUARY 24, 2012

Before POSNER and KANNE, *Circuit Judges*, and PRATT, *District Judge*.[*]

POSNER, *Circuit Judge*. This suit, now in its seventh year, pits Chicago United Industries (which the parties call CUI) and its principals (George Loera and Nick Massarella) against the City of Chicago and two of its

---

[*] Hon. Tanya Walton Pratt of the Southern District of Indiana, sitting by designation.

employees (Mary Dempsey and Louis Langone, whom we need not discuss separately from the City). CUI charges the City with a number of constitutional violations and also, by invoking the supplemental jurisdiction of the district court, with breaches of contract under Illinois law. After an interlocutory appeal to this court, decided in *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940 (7th Cir. 2006), and a number of amendments to the complaint, and other preliminaries, the case finally reached a point at which the defendants could move for summary judgment, which was granted, precipitating this appeal.

CUI sells a variety of products, and has annual sales that vary between about $10 million and $20 million. It purports to be a wholesaler, though there are (or at least were) suspicions that it's really a broker—an intermediary between the wholesalers and the City of Chicago or other purchasers from wholesalers. "'Broker' means a person or entity that fills orders by purchasing or receiving supplies from a third party supplier rather than out of its own existing inventory and provides no substantial service other than acting as a conduit between his or her supplier and his or her customer." Chi. Municipal Code § 2-92-420(c).

The City had certified CUI as an MBE—a minority-owned business enterprise; Loera, the 51 percent owner, is Hispanic. Minority-owned and women-owned business enterprises receive favored treatment by the City; for example, they alone can bid on certain contracts with the City called "target market" contracts. Chi.

Municipal Code §§ 2-92-460(a), (d); City of Chicago Department of Procurement Services, "Your Business Is Certified — Now What?" p. 5, www.cityofchicago.org/content/dam/city/depts/dps/Outreach/YourBusinessIsCertifiedNowWhat.pdf (visited Dec. 7, 2011). The City is virtually CUI's only customer. But early in 2005 the City began to suspect that CUI really was a broker rather than a wholesaler, which if true would make it ineligible to bid for contracts as an MBE because as a broker it would be helping wholesalers who are not MBEs circumvent the City's affirmative-action policy. Office of the Inspector General, City of Chicago, "Review of the Minority and Women-Owned Business Enterprise Program" 2-9, 31-32 (May 2010), www.chicagoinspectorgeneral.org/wp-content/uploads/2011/03/Report_MWBE-ProgramReview.pdf (visited Dec. 20, 2011). The policy goal is to promote minority-owned wholesalers rather than to enable minority brokers to scrape a broker's premium off contracts of non-MBE wholesalers. See *RJB Properties, Inc. v. Board of Education*, 468 F.3d 1005, 1007 (7th Cir. 2006). CUI had at the time only six employees, and though it claims to have had a warehouse, which a broker would not have had, it is hard to see how it could operate a warehouse with so few employees, given the heterogeneous mixture of products—signs, stainless steel, helix light poles, air conditioners, steel cages, sewer bricks, catch basin frames, manhole covers, de-icing chemicals, dog food, laser speed detectors, and more—that it supplies to the City. Maybe it has a small warehouse, from which it distributes some of the products that it sells the City, while acting as a broker for most of its contracts.

Brokers not only may not bid for wholesale contracts, but also may not, by serving as subcontractors to wholesalers, be certified as MBEs. Chicago Municipal Code §§ 2-92-420(c), -480, -540(a). And so the City notified CUI that it was considering revoking its certification, though it never completed its investigation and the company retains the certification to this day.

The City also believed that the company had shorted it on a shipment of aluminum sign blanks, and on that ground notified the company that it was considering debarring it from dealing with the City altogether, whether or not it remained an MBE.

Both notifications—of possible decertification and possible debarment—were issued in March 2005, and for the next five months the City drastically curtailed its purchases from CUI. From an average of $1 million a month they fell to about $190,000 a month, and during this period the company sustained a net loss of more than $600,000, which is the principal item of damages that it seeks.

At the end of the five-month period the City formally debarred the company from selling to the City for three years. The company sued immediately, and promptly sought and obtained a temporary restraining order and as a result the debarment was in effect for only eight days. The City soon abandoned its attempt to debar the company, and in the decision cited earlier we dismissed the defendants' appeal from the district court's order (which had ripened into a preliminary injunction, and thus was appealable) as moot. From that point the

case proceeded as a suit for damages for losses sustained by CUI during the five months of curtailed purchases and the eight days of actual debarment.

We lead off with Loera's and Massarella's claims. We can be brief because they are frivolous. (Actually the entire case is pretty frivolous.) The two principals argue that the eight-day debarment deprived them of their occupational liberty—their right to pursue their chosen occupation—in violation of the due process clause of the Fourteenth Amendment. See, e.g., *Board of Regents v. Roth*, 408 U.S. 564, 573-74 (1972); *Townsend v. Vallas*, 256 F.3d 661, 669-72 (7th Cir. 2001); *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987); *Donato v. Plainview-Old Bethpage Central School Dist.*, 96 F.3d 623, 630-33 (2d Cir. 1996). Even if, as the D.C. Circuit believes, barring a government contractor from doing business with the government, with the effect of destroying the contractor's business because he neither has nor can obtain any other customer, would be a deprivation of occupational liberty (that is, even if a corporation can have a profession, vocation, or calling), *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643-45 (D.C. Cir. 2003); *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 961-62 (D.C. Cir. 1980), an eight-day bar that does not destroy the contractor's business or even permanently weaken it, but causes merely a temporary loss, is not a deprivation of occupational liberty. "A liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or

protracted interruption of employment." *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985). If a lawyer's principal client is a public agency, which gets angry with him and as a result he loses money for five straight months before the agency makes up with him, that is not a de facto revocation of his license to practice law.

Anyway it isn't CUI that's bringing this claim, but Loera and Massarella, and their employment by the company was never interrupted. "One simply cannot have been denied his liberty to pursue a particular occupation when he admittedly continues to hold a job—the same job—in that very occupation." *Abcarian v. McDonald*, 617 F.3d 931, 941-42 (7th Cir. 2010).

So much for Loera and Massarella. The company's principal argument is that the City deprived it of its property without due process of law, the property consisting of its certification as a minority business enterprise. The City didn't actually decertify the company, but the argument is that by drastically reducing its purchases from it for five months the City effectively decertified it for that period, since during that time it had a net loss.

The City argues that certification as a minority business enterprise is not property within the meaning of the word in the due process clause because it is too contingent: it is merely an opportunity to sell to the City rather than a right to do so. On this ground it distinguishes the liquor license that we held to be property in *Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir. 1983). But all a liquor license is is a right to sell liquor; it is not a guarantee that anyone will buy. What makes

it property is that it is a potentially valuable asset to which the holder has a legal entitlement. *Board of Regents v. Roth, supra*, 408 U.S. at 577. An MBE certification is likewise a potentially valuable asset to which the holder has a legal entitlement because it can be revoked only for cause, and on that ground *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 676-77 (7th Cir. 1987), holds that it can be property within the meaning of the due process clause. For "where state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." *Cornelius v. LaCroix*, 838 F.2d 207, 210-11 (7th Cir. 1988); see also *Reed v. Village of Shorewood, supra*, 704 F.2d at 948 ("property is what is securely and durably yours under state . . . law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain").

Although CUI's certification as an MBE was never revoked, there would be de facto revocation, which is treated the same under the due process clause, if the City "destroyed the [certification's] value." *Id.* at 949; see also *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 411-13 (6th Cir. 2002); *Westborough Mall, Inc. v. City of Cape Girardeau*, 794 F.2d 330, 336-37 (8th Cir. 1986); cf. *Parrett v. City of Connersville*, 737 F.2d 690, 693-95 (7th Cir. 1984) (constructive discharge of a public employee in violation of the due process clause). But diminution is not destruction, and diminution is all the company has shown. It continued to bid on City contracts, and won some,

while continuing to function as an MBE on its existing contracts with the City. Throughout the five-month period in question it sold $939,000 worth of goods to the City, some under new contracts, some under existing ones. True, it had nowhere near the same success that it had had before and would have again, and we can assume that the City's hostility was the reason it lost money during the five-month period. But temporary losses are common in business, and do not equate to destruction.

Furthermore, to curtail liberty in conformity with law is not a denial of due process. Otherwise our jails and prisons would be empty. CUI presented no evidence that the City violated any terms of the company's MBE certification in curtailing purchases from the company while pursuing efforts to debar or decertify it. The eventual abandonment of those efforts doesn't show that the City's suspicions that the company was a broker and had cheated it on sign blanks and therefore was an unreliable contractual partner were groundless—that it lacked as it were probable cause to curtail its business with the company. Nor has the company made any showing that the City was forbidden by statute or ordinance or regulation or the terms of its contracts or the language of the company's MBE certification to curtail its dealings with a supplier that it had probable cause to believe was violating the law, while it investigated. So far as appears, the City's provisional self-help remedy was as proper as detaining an arrested person to await a preliminary hearing before a magistrate.

The company makes the further constitutional argument that the City retaliated against it for its filing this lawsuit by continuing to reject its bids and by ignoring complaints and inquiries by Loera and other employees of CUI concerning the City's treatment of the company. The pleadings and other submissions in a lawsuit are (with very rare exceptions) public, and if they articulate issues of public concern, most obviously but not only in "cause" litigation, they are within the scope of the free speech clause (and sometimes the petition for redress of grievances clause) of the First Amendment. See, e.g., *Connick v. Myers*, 461 U.S. 138, 146-48 (1983); *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2493-98 (2011); *Salas v. Wisconsin Dep't of Corrections*, 493 F.3d 913, 925 (7th Cir. 2007); *Rendish v. City of Tacoma*, 123 F.3d 1216, 1219-25 (9th Cir. 1997). CUI's suit includes allegations that the City is wasting the taxpayers' money, which we'll assume is enough to bring the case within the protection of the First Amendment. See *Wainscott v. Henry*, 315 F.3d 844, 849-50 (7th Cir. 2003); *Glatt v. Chicago Park District*, 87 F.3d 190, 193 (7th Cir. 1996). But the actions of which CUI complains were not retaliation but simply the continuation beyond the initial five-month period of the cold-shoulder treatment that the City had given the company during that period because of its suspicions.

Last, CUI claims under Illinois law that the City broke contracts that it had made with the company. The decline in purchases during the five-month period resulted not only from the City's turning down new bids by the com-

pany but also from its reducing its purchase orders under requirements contracts that the City had made with the company and from its refusing to renew some contracts that expired during that period. CUI contends that both the reduced orders and the refusals to renew expired contracts were breaches of contract.

A requirements contract would be empty if the purchaser could at will decide that he "required" less from the seller. To avoid constituting a breach, therefore, a change in requirements has to be in good faith—has to be based for example on a reduction in demand for the purchaser's end product and therefore in the purchaser's demand for the input purchased under the requirements contract, rather than on the purchaser's regretting having made the contract. 810 ILCS 5/2-306(1); *Schawk, Inc. v. Donruss Trading Cards, Inc.*, 746 N.E.2d 18, 25 (Ill. App. 2001). But the seller has the burden of proving that the purchaser acted in bad faith in reducing his "requirements." *Zeidler v. A&W Restaurants, Inc.*, 301 F.3d 572, 575 (7th Cir. 2002) (Illinois law); *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1341 (7th Cir. 1988) (ditto).

CUI's most dramatic example of an alleged breach of one of the requirements contracts is the City's not buying any dog food from the company during the five-month period. Surely, the company argues, the dogs (police dogs) could not go without food for five months—they would have been driven to roam in packs, eating small children, or even each other; the pathetic starved bodies of the weaker or more

fastidious dogs would have littered the Chicago side-walks. None of this happened. Therefore the City must have been getting the dog food from some other supplier, in violation of the requirements contract.

This is conjecture, rather than actual evidence of breach, and contrary conjectures can easily be proposed: that the City had overbought dog food, and was working off a swollen inventory; that it had reduced the number of police dogs as an economy measure; that the dog food that CUI had obtained from its suppliers lately was unpalatable. Only imagination limits conjecture. In a case that had been dragging on for years, the company had ample opportunity in pretrial discovery to ascertain the actual reasons for the decline in orders, and it either failed to avail itself of the opportunity or found no evidence to support its conjecture.

CUI does cite testimony of a City employee named Wolfe that he was ordered not to do any business with the company, period, which is some evidence that the City was failing to obtain its requirements from the company. But the testimony is weak and vague, the key passage in it being that "from that time [the date of the order not to do business with CUI], Wolfe *does not recall* ordering anything from CUI, even on the valid contracts that CUI had with the City" (emphasis added). Should he have recalled it? Who knows? Wolfe's evidence was not enough to raise a triable issue.

In its reply brief CUI mentions for the first time an alleged breach by the City of a contract to deliver sewer bricks. The extended narrative in the district court to

which the brief refers the reader describes complicated contractual maneuvering. The company refused to deliver the bricks unless the City extended the contract term and increased the contract price. A letter from the responsible City official rejected that demand. CUI describes the official as having by that rejection "reneged on her election to extend the contract," yet also states that in the interval between the "election" and the "reneging" "CUI did not have a legal contract . . . and was not required to deliver." After the "reneging," the City placed an emergency order with another supplier, and the company argues that the processing of the order took longer than if the City had ordered from it. Later, it adds, the sewer-brick contract was twice rebid—and CUI won the bid. The City says that it had placed the emergency order with another supplier because CUI was refusing to deliver, pending formal modification of its original contract—CUI acknowledges this. We can't begin to figure out what was going on—or what the breach of contract was.

CUI makes the further argument (again relying mainly on testimony by Wolfe) that during the five-month period the City arbitrarily refused to extend its contracts with the company when the contracts expired. The company argues that an unreasonable refusal to extend a contract is a breach of contract. Not so. The purpose of including an expiration date in a contract is to allow a party to terminate its relationship with the other party without having to give a reason.

This case has dragged on for far too long. It has no possible merit. Let this be the last of it. The judgment in favor of the defendants is

AFFIRMED.