In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3452

ALICE GUTH,

*Plaintiff-Appellant*,

*v.*

TAZEWELL COUNTY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:09-cv-1333-JES—**James E. Shadid**, *Chief Judge*.

ARGUED SEPTEMBER 11, 2012—DECIDED OCTOBER 17, 2012

Before BAUER, POSNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff in this suit under 42 U.S.C. § 1983 seeks damages from the governing body of Tazewell County and from various subordinate agencies and County officials (but we can disregard all the defendants other than the County Board, and treat the Board as the only defendant) for violating her constitutional rights. The district judge granted summary judgment for the defendants.

The plaintiff owns five properties in a mixed rural/ suburban area in central Illinois, nine miles from the City of Peoria and three miles from the Village of Morton (population 16,000). She lives in a house that's on one of the parcels, but that parcel and the house are not involved in the case. The other four parcels, totaling about 190 acres and very near the house, were until recently zoned agricultural; the parties refer to them as parcels "A," "B," "C," and "D." All properties related to the litigation are marked on the accompanying Google aerial photograph:



A hog farm a few hundred feet from the house almost abuts parcels A, C, and D. (B does not abut the farm but can be reached only by driving past it.) The additional properties labeled on the photo are the main hog farm (the one adjoining A, C, and D is a satellite facility), the Fligge parcel, and a parcel called Wolf Crossing. Both of those parcels used to be zoned agricultural, just like A through D, but their owners persuaded the County Board to rezone them as "rural residential"; this was before the plaintiff succeeded in getting her parcels rezoned. Tazewell County's zoning code describes "rural residential" development as "development in areas normally outside the reach of public facilities," Tazewell County Code, tit. 7, ch. 1, § 9(a)—in other words, areas neither urban nor suburban in which nevertheless people can have homes without interfering with agricultural and forestry uses. The larger of the two properties, Wolf Crossing, is now a suburban subdivision.

In September 2004 the plaintiff asked the county's Zoning Board to recommend to the County Board that parcel A be rezoned rural residential. (The rezoning decision is made by the County Board rather than by the Zoning Board.) The Zoning Board instead recommended that the County Board deny her application, and the County Board, agreeing, did so the following month. A year later the plaintiff asked the Zoning Board to recommend that B and C be rezoned rural residential; but again agreeing with the Zoning Board, the County Board denied her applications.

The plaintiff responded to these disappointments by suing the County Board in an Illinois state court. But on the day, in October of the following year (2006), on which the trial was to start, she agreed to a settlement with the defendant, which the court entered on the court record as an "Agreed Order." The settlement was not approved by the Board itself, even though it was the defendant, but by the Board's Risk Management Committee, which is authorized to make binding settlements on behalf of the entire Board. See 55 ILCS 5/1-6006. The Agreed Order stated that the Board now agreed that parcels A, B, and C—as well as parcel D, which the plaintiff had not applied to rezone along with the other parcels—should be rezoned rural residential. It seems that the Board had based its earlier denial of the plaintiff's applications, in part at least, on the proximity of the auxiliary hog farm, but had since learned that the owner of the two hog farms was planning to close them.

One might think the relevance of the hog farms to the Board's original decision would have been that the plaintiff's parcels, because of their proximity to the hogs, were considered unsuitable for (human) residences. Not so; the concern was not with the people who might live on these parcels but with the hogs.

If the County Board wanted to retain a flourishing agricultural industry in Tazewell County—as apparently it does, for we read on its official website, "Welcome to Tazewell County, Illinois," www.tazewell.com (visited Sept. 12, 2012), that "agriculture is an important compo-

nent of Tazewell County's history and economy and it is ingrained with the County's identity and way of life. Seventy-eight percent of the County's land area consists of farmland, and agriculture is poised to remain one of the County's defining industries"—it could not allow unlimited residential development on land currently zoned for agriculture. Residential development could squeeze out agriculture long before all the agricultural land had been bought for homes, because if the character of the county changed from predominantly agricultural to predominantly residential, the home-owners would have a potential claim of nuisance against the farmers—not least the hog farmers.

It might seem that anyone who bought a home a few hundred feet from a hog farm would not be heard to complain about the grunts and odors emitted by the hogs; the buyer would have been compensated by an appropriate discount in the price of the land for the home. But when the character of an area changes gradually from commercial or industrial or agricultural to residential, the homeowners, even though they bought with knowledge of those uses of the land adjacent to them, usually can seek to abate those uses as private nuisances. *Oehler v. Levy*, 85 N.E. 271, 273 (Ill. 1908); *Woods v. Khan*, 420 N.E.2d 1028, 1031 (Ill. App. 1981); see *Spur Industries, Inc. v. Del E. Webb Development Co.*, 494 P.2d 700, 706-08 (Ariz. 1972). We say "usually" because Illinois's Farm Nuisance Suit Act, 740 ILCS 70/3, which has counterparts in other states, alters the common law's rejection of the defense of "coming to the nuisance" by insulating farmers against nuisance

suits after a farm has been in operation for a year—but with exceptions.

Allowing nuisance suits by newly arrived residents is a sensible rule because it enables land to be put to its highest-valued use; residential uses of land are very often more valuable (judging by price) than non-residential uses, such as agriculture. Sensible or not, allowing such suits does threaten farmers, and if the County Board wanted to preserve Tazewell County's agricultural industry without relying entirely on the Farm Nuisance Suit Act, with its exceptions, this was a reason to deny the plaintiff's rezoning applications even though her parcels were not at present being used for hog farming, or indeed for anything. But this ground for denial seemed to vanish when the owner of the hog farms declared that he was closing the farms. The Risk Management Committee decided there was no longer a sound basis for resisting the plaintiff's state court lawsuit, and so it settled.

But although the Agreed Order stated that parcels A through D should be rezoned for residential use, it did not *order* that they be rezoned, and it could not. The state courts have plenary power to review zoning decisions, 55 ILCS 5/5-12012.1, but no authority to rezone property. The County Board has that authority, but could exercise it only in accordance with the County's procedures for rezoning. Those procedures required a hearing before the Zoning Board and (if a neighboring landowner filed a formal objection) a three-fourths vote by the County Board in favor of the rezoning, for the

rezoning to be approved. Tazewell County Code, tit. 7, ch. 1, §§ 26(f)-(h).

One year after the Agreed Order was entered, the Zoning Board held the required hearing on the plaintiff's rezoning applications, and this time it recommended that they be approved. The County Board considered the recommendation and voted 11 to 10 in favor of granting the applications. But because that was less than a three-fourths majority and a formal objection had been filed, the vote resulted in the denial of the applications. At the same meeting the Board agreed to rezone the Fligge parcel from agricultural to rural residential; Wolf Crossing had been rezoned similarly earlier.

At last, the next year (2008), the Board relented and granted the plaintiff's applications. But by this time the real estate market had collapsed, and her parcels were no longer worth more zoned residential than they had been when zoned agricultural. The plaintiff had gained nothing from the rezoning because of the three years it had taken her to obtain it, more precisely because of the year's delay after the Board's meeting in October 2007 at which her applications had again been denied.

She argues that she was turned down at that meeting because the Board's members were angry with her for having sued the Board over the previous denial of the applications, and angry too with the state court for having entertained that suit. At the meeting one of the Board's members remarked acidly that if the state court judge wanted to do zoning he should resign and join

the Zoning Board, and another described himself as "incensed" at the court. One might wonder why, if the Board was offended by the state court suit, it had settled rather than fought it and if necessary appealed an adverse judgment to a higher state court. But maybe the Board's membership had changed in the year that elapsed between the Agreed Order and the contentious meeting, and become feistier. And remember that the settlement had been made by a committee of the Board rather than by the entire Board, and members of the Board who were not on the committee may have disapproved of it.

If, as the plaintiff contends, the Board's failure to grant the rezoning applications violated the Agreed Order, one might also wonder why she didn't seek a judgment of contempt from the state court, which (if one may judge from the Board's hostile reaction) had been friendly to her suit; or seek plenary judicial review of the Board's decision, as she had done previously. She couldn't actually have obtained a judgment of contempt for violation of the settlement, however, because the Board could not rezone without a three-fourths vote, and the vote to rezone failed to reach that threshold. The Risk Management Committee, a mere sliver of the Board, could not commit the Board to rule favorably on the applications, whatever the Agreed Order said, as that would require the Board's closing its collective ears to whatever might occur at the rezoning proceeding that might provide grounds for denial. And in fact something *did* occur that supported denial and may have swung critical votes against rezoning—the Board was

told that the hog farmer had changed his mind and was turning the auxiliary hog farm that abutted parcels A through D over to his son, who would continue to operate it. And a Board member had gone and looked at the auxiliary farm and reported that there were 60 to 100 hogs there.

The plaintiff challenges the October 2007 denial of her rezoning applications on three grounds. The first is that it constituted invidious discrimination in favor of the owners of the Fligge and Wolf Crossing parcels and thus a denial of equal protection to a "class of one." (She doesn't claim to be a member of a traditionally discriminated-against class.) *Village of Willowbrook v. Olech*, 528 U.S. 562, 563-64 (2000) (per curiam); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000); see *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc). The aerial photo indicates, however, that both parcels are farther from the main hog farm than the plaintiff's parcels are from the auxiliary hog farm, and anyway there was evidence before the Board that the hogs had been removed from the main farm.

The plaintiff's second ground of attack is that the denial of rezoning was in retaliation for her bringing the state court suit. The filing of a lawsuit can be an exercise of the First Amendment right of free speech if, as in "cause" litigation, the suit articulates public concerns. *NAACP v. Button*, 371 U.S. 415, 429-30 (1963); *Chicago United Industries, Ltd. v. City of Chicago*, 669 F.3d 847, 852 (7th Cir. 2012); *Glatt v. Chicago Park District*, 87 F.3d 190, 193 (7th Cir. 1996); *Yatvin v. Madison Metropolitan School*

*District*, 840 F.2d 412, 419-20 (7th Cir. 1988). But the sole aim of the plaintiff's zoning suit was to enhance the value of her property. A suit such as hers, designed to rectify a private grievance, could however be protected by the petition clause of the First Amendment against retaliation. *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2498 (2011). But there would be no need to bring the heavy artillery of a federal lawsuit into play, because state remedies would be entirely adequate. The Illinois courts can take effective measures against persons, including local government officials, in Illinois who try to punish people who turn to those courts for relief, as the plaintiff in this case did. *Batagiannis v. West Lafayette Community School Corp.*, 454 F.3d 738, 742-43 (7th Cir. 2006); *Woodruff v. Mason*, 542 F.3d 545, 560-61 (7th Cir. 2008) (concurring opinion).

And in arguing retaliation she encounters an unsuspected obstacle: it is more difficult to prove the bad intent of a legislative body, which is a collective, than of an individual. Remember that a majority of the Board voted in favor of the rezoning; they, at least, must be exonerated from the charge of having retaliated against the plaintiff for her state court suit. As for the others, only two of them expressed irritation at the suit. Several others said they wanted to protect agriculture in this part of the county—a nonretaliatory motive for voting against the applications. Some of the members who voted against rezoning didn't indicate a reason, and as a result we don't know whether enough votes were motivated by a desire to retaliate to defeat the rezoning. Finally, the refusal to rezone the parcels could

not be thought an irrational destruction of value actionable as a denial of substantive due process, see, e.g., *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir. 1988)—the equivalent of a taking of property not for a public purpose.

That completes our discussion of the plaintiff's liability claim, but for completeness we note that her claim for relief is flawed as well. She says that in 2007 her parcels were worth less than $5,000 per acre zoned agricultural but would have been worth more—much more—than $25,000 per acre had they been zoned residential and that she would have sold at least some of them then. That is a permissible theory of damages. But she is also or alternatively seeking damages for the loss of value she would have sustained on parcels not sold, the loss caused by the collapse of the housing market when the housing bubble burst and brought much of the economy down with it, with the result that by the time the rezoning was finally approved in 2008 her land was worth no more for residential than for agricultural use.

The County Board was of course not responsible for the housing bubble or its collapse. The collapse was not foreseen. There was no way the Board could have gauged the risk of a collapse in residential housing values, in which case a delay in granting rezoning applications would harm the plaintiff. Generally a tortfeasor (the plaintiff is accusing the Board of federal constitutional torts, for which 42 U.S.C. § 1983 creates a federal remedy) is not liable for creating unforeseeable risks. This principle is old. It is illustrated by *Berry v. Sugar Notch*

*Borough*, 43 Atl. 240 (Pa. 1899), a case in which the motor-man of a trolley, by speeding, caused the trolley to arrive beneath a tree at the moment the tree collapsed, damaging the trolley. The speeding had not increased the likelihood of such an accident, as distinct from the likelihood of a derailment, and so imposing liability would not have induced the trolley system to adopt safety measures designed to avoid a future such accident.

In modern law the principle of the *Berry* case is discussed in terms of the distinction between "but for" causation (sometimes called transaction causation, and by philosophers a necessary condition) and loss causation, and is illustrated by a case in this court analytically identical to the present one. In *Movitz v. First National Bank*, 148 F.3d 760, 763-64 (7th Cir. 1998), had it not been for the defendant's negligence, the plaintiff would not have found himself owning a building when a disastrous downturn in the local real estate market greatly reduced the building's value. But the defendant bore no responsibility for that downturn, and hence, we held, it was not liable for the reduction in value.

"But for" causation or transaction causation refers to acts of the defendant that cause the plaintiff to be in the wrong place at the wrong time, and loss causation to acts, which can be of someone or something else, that *made* it the wrong place at the wrong time. The Board's delay in granting the applications to rezone resulted in the plaintiff's properties being rezoned at a time when residential zoning had lost its value. But it had lost its value for reasons unrelated to anything the Board

had ever done, and for that loss the Board could not be held liable.

AFFIRMED.