In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-2031

JESSICA BIGGS,

*Plaintiff-Appellant,*

*v.*

CHICAGO BOARD OF EDUCATION,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-6183 — **Mary M. Rowland**, *Judge.*

———————————

ARGUED FEBRUARY 23, 2023 — DECIDED SEPTEMBER 18, 2023

———————————

Before SYKES, *Chief Judge,* and ROVNER and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* Jessica Biggs was the interim principal of Edmund Burke Elementary School (Burke), part of the Chicago Public Schools (CPS) system, from 2012 to 2018. She was fired after a publicly disclosed investigation found that she had violated CPS policies. Biggs has not worked as a principal

since. She sued the Chicago Board of Education (the Board)[1] under 42 U.S.C. § 1983, alleging that the Board deprived her of her liberty to pursue her occupation as a school administrator without due process when it made stigmatizing public statements about her in connection with her termination. The district court granted the Board's motion for summary judgment, holding that no reasonable jury could find that Biggs had suffered a tangible loss of employment opportunities within her occupation. *Biggs v. Chi. Bd. of Educ.*, No. 18-cv-6183, 2022 WL 1591577, at \*8–9 (N.D. Ill. May 19, 2022). We agree and affirm.

## I.      BACKGROUND

### A.  Biggs's Role and CPS Policies

Biggs served as Burke's interim principal on an at-will basis. Her duties included ensuring that Burke employees complied with CPS policies. Two policies are relevant here: the "Attendance Policy" and the "Transportation Policy."

Under the Attendance Policy, teachers must document student attendance as follows: a student is to be recorded as "Present" if she receives at least 300 minutes of instruction in a day; "Half-Day Absent" if she receives 150 to 299 minutes of instruction; and "Full-Day Absent" if she receives fewer than 150 minutes of instruction.

The Transportation Policy provides that no employee at a CPS school may drive a student in a personal vehicle without first obtaining written consent from the school's principal and the student's parent or legal guardian. Additionally, the

---

[1] The Board is a municipal body that oversees the CPS system pursuant to Illinois law. 105 ILCS 5/34-2.

principal must ensure that an authorized driver is licensed and insured and must retain copies of the license and insurance documentation.

## B. Investigation, Termination, and Public Statements

The Board's Office of Inspector General (OIG) received an anonymous tip in 2017 of violations of the Attendance Policy at Burke. After investigating, the OIG summarized its conclusions in a May 2018 report. It stated that (1) for multiple years, Biggs had been directing her subordinates to mark late students as tardy, rather than absent, regardless of how many instructional minutes they had received in a day; (2) this practice had likely skewed Burke's attendance data for several years; and (3) Biggs also had violated the Transportation Policy.[2] As to the last point, Biggs admitted to investigators that she had ordered Burke employees to pick up students in personal vehicles, but had failed to obtain written parental consent and did not keep copies of the drivers' licenses or insurance documentation.

In June 2018, the Board fired Biggs and designated her Do Not Hire (DNH). DNH is an internal designation within the CPS system to note when a CPS employee was terminated for incompetence or misconduct. A DNH designation, as its name implies, prohibits any CPS school from rehiring the employee. But it does not necessarily prevent the employee from getting a job at a non-CPS school.

---

[2] Biggs disputes the accuracy of these findings and the completeness of the investigation. We express no opinion as to these arguments, however, because they are not germane to our decision for the reasons noted below.

The Board disclosed the reasons for Biggs's termination to the public on two separate occasions. On July 9, 2018, officials from the Board discussed Biggs's alleged policy violations at a Burke community meeting. The Chief of Schools for CPS stated at the meeting that Biggs's firing was "about integrity"; the comments were reported by the media. Two weeks later at another public meeting, Board officials distributed a redacted copy of the OIG report and read it aloud.

## C. Biggs's Post-Termination Job Search

After her firing, Biggs reentered the job market. She received an offer to serve as an assistant principal at Ravenswood Elementary School, another CPS institution, but that fell through due to her DNH designation. It is clear that Ravenswood officials were aware of Biggs's DNH; what is less clear is whether they knew about CPS's public comments regarding the reasons for her termination.

Biggs also searched for principal openings at suburban schools in the summer of 2018. But schools that had openings had already hired their principals for the upcoming school year, so no positions were available.

Additionally, Biggs applied for jobs at the Academy Group, Alternative, Inc., Teach Plus, Leading Educators, and the Obama Foundation; none proved fruitful. She did receive an interview with Alternative, Inc., but that was as far as she got. Biggs provides scant information about what these positions entailed or whether she was qualified for them. The record is also devoid of any information about whether any of these organizations were aware of the Board's public statements about Biggs's termination. As for the Academy Group and Leading Educators, Biggs believes that they did not hire

her because they received funding from CPS, and her DNH status barred them from doing so.

The only prospective employer that was aware of the Board's public allegations against Biggs was the LEARN Charter Network, a network of charter schools. Biggs applied to be a director of operations there (again, she provides no details regarding the responsibilities or qualifications that came with this role). She received an interview, and the interviewer informed Biggs that he was aware of the allegations involving Burke, but he nonetheless proceeded with the interview. Ultimately, Biggs was not hired.[3] According to Biggs, she later learned that her DNH status had precluded her from advancing in the application process.

In August 2018, Biggs found a job with the Judicial Accountability Project, a nonprofit organization that seeks to raise awareness about judicial elections. Then, in November 2018, she began working with the Southwest Organizing Project, where she managed a "collaborative of nine social services, healthcare, and behavioral health organizations, and

---

[3] Former LEARN employee Sarah Adams filed a declaration under oath, stating that, at the time of Biggs's application to LEARN, LEARN had reached, or was negotiating, an agreement with CPS that prohibited LEARN from hiring anyone designated DNH by CPS. The district court held that Adams's declaration was inadmissible because Biggs had not disclosed Adams as a witness during discovery. *Biggs,* 2022 WL 1591577, at *8. Biggs now argues that the district court erred because her nondisclosure was harmless, but she did not raise this issue before the district court and thus cannot do so here. *Mother & Father v. Cassidy*, 338 F.3d 704, 707 (7th Cir. 2003) ("[A] party may not raise on appeal an issue it did not present to the district court.").

four local schools." *Biggs*, 2022 WL 1591577, at \*8. Biggs stopped looking for principal jobs around this time. The following year, in August 2019, Biggs and a colleague started an educational consulting firm assisting local school districts.

## D. Proceedings Below

Biggs sued the Board under 42 U.S.C. § 1983, alleging that the Board deprived her of her liberty interest[4] in the pursuit of her occupation without due process. It did so, Biggs asserts, by making stigmatizing public statements about her after she was fired, effectively preventing her from being rehired as a school administrator. The district court granted the Board's motion for summary judgment. Noting that Biggs had obtained jobs in the "field of education" after her termination, the district court concluded that Biggs had not created a genuine issue of material fact as to whether she had been deprived of employment opportunities within her occupation, as was her burden. *Biggs*, 2022 WL 1591577, at \*8–9.[5]

---

[4] Biggs also originally argued that she had been deprived of a property interest in her continued employment at Burke. Biggs has wisely abandoned this argument, since she was employed at will and has not pointed to any evidence establishing "a legitimate expectation of continued employment based on a legitimate claim of entitlement." *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007).

[5] The district court also held that Biggs had failed to establish that the Board could be held liable under § 1983 as a municipal entity. *Biggs*, 2022 WL 1591577, at \*9–10; *see generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Because we agree with the district court that Biggs has not created a genuine factual issue as to whether she has suffered a deprivation of her occupational liberty, we need not address this point.

## II. LEGAL STANDARD AND STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo. REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those that "might affect the outcome of the suit," and a factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a material factual dispute exists, we "construe all facts and draw all reasonable inferences in a light most favorable to the non-moving party." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017).

## III.     DISCUSSION

Section 1983 creates liability for any person who, acting under color of state law, deprives a plaintiff of her constitutional rights.[6] Biggs claims that the Board violated her rights under the Fourteenth Amendment's Due Process Clause, which prohibits any state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Here, Biggs invokes her right to "liberty," specifically "occupational liberty—'the liberty to follow a trade, profession, or other calling.'" *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (quoting *Lawson v. Sherriff of Tippecanoe Cnty.*, 725 F.2d 1136, 1138 (7th Cir. 1984)).

---

[6] The Board is a "person" for purposes of § 1983. *See Quinn v. Illinois*, 887 F.3d 322, 325 (7th Cir. 2018).

An aggrieved person can bring an occupational liberty claim against a former public employer when, after an adverse employment action, the employer stigmatizes her "by making public comments impugning [her] good name, honor, or reputation or imposes a stigma that forecloses other employment opportunities" within her occupation. *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573–74 (1972)). To prevail on such a claim, a plaintiff must establish "that (1) the defendant made stigmatizing comments about [her]; (2) those comments were publicly disclosed; and (3) [she] suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Id.* We assume that the Board's comments about Biggs at the July 2018 community meetings satisfy the first two elements of this test, but her claim fails at the third.

An occupational liberty plaintiff faces a high hurdle to show that she has suffered a tangible loss of employment opportunities from a defendant's public stigmatizing statements. Indeed, she must demonstrate that the statements have made it "*virtually impossible* for her to find new employment" within her occupation. *Ratliff v. City of Milwaukee*, 795 F.2d 612, 625–26 (7th Cir. 1986) (emphasis added). Mere frustration or delay in getting a new job will not suffice. *See Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (stating that an occupational liberty claim requires evidence that the defendant's public statements "had the effect of blacklisting the employee from employment in comparable jobs") (quoting *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987)); *Wroblewski*, 965 F.2d at 456 (stating that "permanent exclusion from or protracted interruption of employment" is required to make out an occupational liberty claim); *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985) (indicating that an

occupational liberty claim will not lie if the plaintiff is only "somewhat less attractive to some other employers" (quoting *Roth*, 408 U.S. at 574 n.13)).

## A. Biggs's Occupation

Before we go any further, we must define Biggs's "occupation." On the one hand, Biggs claims that her occupation is school administration. On the other hand, the district court characterized Biggs's occupation as the "field of education," and it concluded that Biggs could not establish that she had been excluded from that occupation because her jobs at the Southwest Organizing Project and her education consulting firm fell within that field. *Biggs*, 2022 WL 1591577, at *8. In doing so, however, we think the district court defined Biggs's occupation too broadly.

We have described occupational liberty, as protected by the Due Process Clause, as "the liberty to follow a trade, profession, or other calling." *Wroblewski*, 965 F.2d at 455 (quoting *Lawson*, 725 F.2d at 1138). Like much in the law, it is best to think of an occupation as existing on a spectrum of generality—somewhere between a "specific job" and a "field." At one extreme, the Due Process Clause does not protect an individual's right to remain in any one "specific job." *Id.* "It stretches the concept [of occupational liberty] too far to suggest that a person is deprived of 'liberty' when [she] simply is not rehired in one job but remains as free as before to seek another." *Roth*, 408 U.S. at 575. In other words, the mere "removal of one job or employer from the universe of all jobs does not affect occupational liberty." *Blackout Sealcoating, Inc. v. Peterson*, 733 F.3d 688, 690 (7th Cir. 2013). Along these lines, we have held that, while being a police officer is an occupation, being a police *lieutenant* is a specific job that cannot create an

occupational liberty interest. *Ill. Psych. Ass'n v. Falk*, 818 F.2d 1337, 1344 (7th Cir. 1987); *see also Bigby v. City of Chi.*, 766 F.2d 1053, 1057 (7th Cir. 1985) (stating that "ranks within an occupation" are not separate occupations). Applied here, Biggs could not (and does not) claim that her "occupation" is serving as a school principal.

At the other extreme is a "field" of employment. Used in this context, a field is "an area of activity or interest." *Field*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/field (last visited Sept. 5, 2023); *see also Field*, Merriam-Webster, https://www.merriam-webster.com/dictionary/field (last visited Sept. 5, 2023) ("[A]n area or division of an activity, subject, or profession."). And a field often includes a number of interrelated, yet distinct, occupations. For example, medicine is a field, which includes various occupations such as nurses, doctors, and therapists. *Bigby*, 766 F.2d at 1057. Thus, a doctor who, upon termination, can only find work as a nurse can bring an occupational liberty claim, even though she still works in the medical field. *See id.* (stating that an occupational liberty claim "rest[s] on the idea that stigmatization may prevent [an employee] from getting another position in the same line of work"); *see also Townsend*, 256 F.3d at 670 (indicating that an occupational liberty claim will lie when an employee has been "blacklist[ed]" from "comparable jobs" (quoting *Colaizzi*, 812 F.2d at 307)).

Thus, determining a plaintiff's "occupation," as distinguished from a specific job or field, requires a case-specific inquiry and a healthy dose of common sense. An occupation entails the performance of a discrete set of professional responsibilities that can be meaningfully distinguished from those of other occupations in a field. An occupation may also require

a particular type of professional education, training, or licensure that other occupations do not. But the performance of professional duties for a *particular* employer or customer or at a *particular* level of prestige or authority is a specific job, not an occupation. To provide another example, food service is a field of employment, in which a cook has a different occupation from that of a waiter. But a cook would not have an occupational liberty interest in serving as the head chef at a famous restaurant. That is a specific job within his occupation.[7]

With these principles in mind, we think the district court erred when it defined Biggs's occupation as the "field of education." Education is a field of employment that encompasses many occupations. Within that field, Biggs's occupation, as she herself states, is that of a school administrator. A school administrator's responsibilities include overseeing or managing the logistical operations of schools. These duties distinguish the occupation of school administration from other occupations within education, such as classroom instruction. Also, Biggs has obtained special education, training, and licensure in school administration. She has a master's degree in education with a concentration in "School Leadership" from Harvard University; she trained as a principal intern and a resident principal before starting at Burke; and she has completed multiple professional development courses for school

---

[7] One issue not raised by the parties is whether the definition of a plaintiff's "occupation" is a question of law or fact. We need not decide that issue here, but note only that, in the past, we seem to have implicitly treated the inquiry as one of law, and district courts within this circuit have done the same. *See Wroblewski*, 965 F.2d at 455–56; *Falk*, 818 F.2d at 1344; *Bigby*, 766 F.2d at 1057; *Martin v. Haling*, No. 21 C 5494, 2022 WL 14634854, at *8 (N.D. Ill. Oct. 25, 2022) (citing district court cases).

administrators. She also has an Illinois principal's license, which is distinct from a teacher's license (which Biggs does not have). These facts demonstrate that school administration is a distinct profession or calling within the educational field. By contrast, the position of school principal is a specific job at a particular rank within her occupation. Vice and assistant principals, attendance clerks, and the like are also school administrators, even though their jobs are perhaps less lucrative and prestigious than that of a principal.

From this, it follows that the jobs Biggs succeeded in obtaining (the jobs at the Southwest Organizing Project and her consultancy), while they may be in the education field, were not within her occupation of school administration. Although both positions involved work with schools, there is no indication that Biggs had any input into school operations, as a school administrator would. Nor is there any evidence that Biggs had to be licensed as a school administrator to perform either job. Thus, Biggs's ability to obtain these jobs does not doom her occupational liberty claim.

## B. Tangible Loss of Employment Opportunities

Having defined Biggs's occupation, we now ask whether a reasonable jury could conclude that she suffered a tangible loss of employment opportunities in that occupation as a result of the Board's public stigmatizing statements. *Palka*, 623 F.3d at 454. To answer that question, we first must identify the "public stigmatizing statements" at issue. As noted, we will assume that the Board's statements at the two Burke community meetings in July 2018 (at least one of which was reported in the media) qualify as such for purposes of Biggs's claim. Biggs also contends that her DNH designation is a public stigmatizing statement, but on this point we disagree.

A public stigmatizing statement is one that is distributed "in a manner which would reach future potential employers of the plaintiff or the community at large." *Ratliff*, 795 F.2d at 626–27. Because Biggs's DNH designation was internal to CPS, it does not qualify. *See id.* (holding that internal publication of reasons for police officer's discharge could not support occupational liberty claim). Admittedly, at least according to Biggs's testimony, her DNH status precluded her from being hired at LEARN, because LEARN was affiliated with CPS and abided by the DNH designation. She also attested that her DNH status might have found its way to other organizations that receive funding from CPS, including Leading Educators and the Academy Group. But, taking these statements to be true, we do not find this highly limited dissemination sufficient to turn Biggs's DNH status into a "public statement" for purposes of an occupational liberty claim. *See id.* at 627 (noting that an occupational liberty claim requires that stigmatizing statements be subject to "broader publication").

Furthermore, even if CPS's DNH designation of Biggs qualified as a public stigmatizing statement, no reasonable jury could conclude that Biggs has suffered a tangible loss of employment opportunities "as a result" of it. *Palka*, 623 F.3d at 454. As noted, to succeed in her occupational liberty claim, Biggs must show that she has been essentially frozen out from all meaningful opportunities to work as a school administrator. *See id.* She cannot make that showing merely with evidence that she can no longer work for CPS or CPS-affiliated organizations due to her DNH. After all, CPS is just "one of many school systems in the [Chicago] metropolitan area and state [of Illinois]." *Townsend*, 256 F.3d at 671 (cleaned up). And this is not a situation when a single employer "so dominates the field of opportunity" in an occupation that inability to

work for that employer would constitute a denial of occupa-
tional liberty. *Id.* (quoting *Joint Anti-Fascist Refugee Comm. v.
McGrath*, 341 U.S. 123, 185 (1951) (Jackson, J., concurring)). As
such, Biggs's DNH designation within CPS cannot support
her occupational liberty claim.

Turning next to the Board's statements at the July 2018
community meetings, we ask whether those statements have
made it "virtually impossible" for Biggs to find work as a
school administrator. *Ratliff*, 795 F.2d at 626. Biggs introduced
the following evidence to support her claim: after she was
fired in June 2018, she searched for principal openings for a
few months, but she could not find any because they had al-
ready been filled for the upcoming school year. Additionally,
Biggs applied without success to positions at (1) Ravenswood,
(2) LEARN, (3) Leading Educators, (4) Teach Plus, (5) the
Academy Group, (6) Alternative, Inc., and (7) the Obama
Foundation. Unfortunately for Biggs, these facts cannot save
her claim.

First, Biggs simply did not apply to enough school admin-
istration positions for a sufficiently lengthy duration of time
to permit a reasonable jury to find that she has been excluded
from that occupation altogether. Of Biggs's seven unsuccess-
ful applications, only one was for a school administration po-
sition—the assistant principal job at Ravenswood—and she
received an offer (although she could not take the position
due to her DNH designation). The other six applications were
predominantly to education-focused organizations rather
than schools. And Biggs provides few, if any, details about the
responsibilities or qualifications those positions entailed (for
instance, we do not know if any of them required Biggs to be

a licensed school administrator or involved duties akin to those of a school administrator).

Biggs points out that she did look for principal jobs after she was terminated and found no openings. But that is hardly surprising, given that she searched only for a few months in the summer, at a time when schools had already selected their principals for the upcoming school year. In addition, she apparently confined her search to Chicago's suburbs, even though she is licensed as a principal in the State of Illinois. And she limited her review to principal openings, rather than other school administration positions. Biggs's exceedingly brief, ill-timed, and narrow search does not provide triable evidence that it is "virtually impossible" for her to find work as a school administrator. *Ratliff*, 795 F.2d at 626.

Second, given the limited number of positions to which Biggs applied, no reasonable jury could find that she has experienced anything more than the customary difficulties and delay that individuals encounter when looking for a new job, especially where, as here, they were fired from their previous one.[8] *See Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d 1174, 1184 (7th Cir. 2001) (holding that no reasonable factfinder could conclude that it was "virtually impossible" for plaintiff to find work within her occupation where she had applied to just seven jobs); *see also* Michael R. Dalton & Jeffrey

---

[8] Of course, the Board necessarily stigmatized Biggs to some degree when it fired her. But as we have said, the stigma inherent in termination alone cannot support a claim for deprivation of occupational liberty. Rather, due process is implicated only if the employer makes stigmatizing public statements in connection with an adverse employment action and *those statements* cause a tangible loss of employment opportunities. *See Palka*, 623 F.3d at 454.

A. Groen, *How Do Jobseekers Search for Jobs? New Data on Applications, Interviews, and Job Offers*, U.S. Bureau of Lab. Stats. (Nov. 2020), https://www.bls.gov/opub/btn/volume-9/how-do-jobseekers-search-for-jobs.htm (showing the probability of getting a job is at its highest after 21–80 applications). Biggs's failure to find a role after so few attempts is unremarkable and falls short of demonstrating unusual or insurmountable obstacles to reemployment, within her occupation or otherwise.

Finally, Biggs has not produced evidence that any difficulties she faced in obtaining employment were a "result" of the Board's public stigmatizing statements. *Palka*, 623 F.3d at 454. The record is devoid of any evidence that the public allegations against Biggs made her significantly less attractive to potential employers. And there is no evidence that any of the prospective employers outside CPS even *knew* about those allegations, except for LEARN. *See Piccoli v. Yonkers Bd. of Educ.*, No. 08-CV-8344 (CS), 2009 WL 4794130, at *3–4 (S.D.N.Y. Dec. 11, 2009) (dismissing occupational liberty claim where it was "not even clear whether … prospective employers knew or could know that Plaintiff was the subject of the alleged statements"). And even at LEARN, Biggs was not rejected out of hand. The LEARN employee who interviewed Biggs knew about the circumstances of her termination and yet interviewed her anyway.

Nor was LEARN the only entity that seemed interested in Biggs. Ravenswood even gave Biggs a *bona fide* job offer within her occupation, as an assistant principal.[9] Biggs also

---

[9] As noted, Biggs could not accept the Ravenswood job due to her DNH designation, and there is some evidence that LEARN declined to

received an interview with Alternative, Inc. Biggs's ability to obtain interviews and job offers shows that the public allegations against her were not so serious or widely disseminated as to prevent her from obtaining employment. *See Thuet v. Bd. of Educ.*, No. 20 C 1369, 2022 WL 6122622, at *7 (N.D. Ill. Oct. 7, 2022) (holding plaintiff had not created a genuine factual issue as to whether she had suffered a tangible loss of employment opportunities where she had obtained "interviews and two job offers").

In sum, no reasonable jury could find on this record that Biggs has suffered a tangible loss of employment opportunities as a result of the Board's public allegations against her. The district court rightly entered summary judgment in the Board's favor.

## IV.    CONCLUSION

We have considered Biggs's remaining arguments, and they lack merit. The judgment of the district court is AFFIRMED.

---

hire her for the same reason. But as we explained, Biggs's internal DNH designation alone cannot support her occupational liberty claim.