In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-3108

SUZY MARTIN,

*Plaintiff-Appellant,*

*v.*

SUSAN HALING, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 21-cv-05494 — **Gary Feinerman**, *Judge.*

ARGUED DECEMBER 6, 2023 — DECIDED MARCH 1, 2024

Before FLAUM, EASTERBROOK, and BRENNAN, *Circuit Judges.*

FLAUM, *Circuit Judge*. Suzy Martin alleges that she was deprived of her occupational liberty after an Illinois agency reported that she engaged in an illegal kickback scheme. Although the report precipitated a sharp decline in her company's revenue, the district court dismissed Martin's complaint. Since Martin's company stayed afloat and in the same line of business after the report's publication, we affirm.

## I.   Background

Suzy Martin is the owner and president of Smart Elevators Co., a Chicago-area elevator service and repair company. She is both a woman and a minority, so the company is a certified minority- and woman-owned business in both the State of Illinois and the City of Chicago. These certifications allow Smart Elevators to take advantage of special procurement rules when seeking work with either the State or the City. As a result, historically, most of Smart Elevators's business came from the State and City. By contrast, only about 20 percent of the company's revenue came from private sector clients.

Smart Elevators's customer portfolio changed when a whistleblower complaint jeopardized its working relationships with both the State and City. The complaint alleged that Martin and Smart Elevators engaged in a bribery and kickback scheme with a University of Illinois Chicago employee. The Office of the Executive Inspector General for the Agencies of the Illinois Governor (OEIG) reacted by launching an investigation into the allegations, which the agency suspended after it referred the matter to the United States Attorney's Office.

Before the federal investigation concluded, OEIG discovered that Smart Elevators had submitted a new bid to the University. OEIG and Illinois's Executive Ethics Commission responded to the bid by sending the University a report so it could make an "informed decision in its procurement process." The report concluded that Martin, Smart Elevators, and the University employee engaged in a kickback scheme that violated Illinois ethics law and University policy. It also recommended that the University terminate its existing contracts

with Martin and Smart Elevators and bar them both from future work.

About a year after OEIG privately issued its report to the University, federal prosecutors indicted Martin on four bribery charges. After the indictment but before Martin's trial, the Executive Ethics Commission publicly disclosed the OEIG report. Even though a jury acquitted Martin in federal court, the Executive Ethics Commission and OEIG never rescinded the report.

The State and City ceased doing business with Martin and Smart Elevators in response to the report.[1] The company consequently lost millions of dollars in preexisting and potential contracts, eliminating most of its business. According to Martin, she and Smart Elevators also lost the ability to utilize the procurement rules favoring women- and minority-owned businesses since the City and State were no longer viable clients.

To save Smart Elevators, Martin changed its business model by focusing on private sector work, utilizing new geographic markets, and expanding the scope of the company's work. Martin's efforts succeeded: Smart Elevators remains in operation, and she is still its owner and president.

In the OEIG report's aftermath, Martin sued several State and City entities and officials under 42 U.S.C. § 1983, bringing "stigma-plus" procedural due process claims under the

---

[1] Additional State and City agencies that contracted with Smart Elevators prior to the report's publication included: University of Illinois Chicago, Chicago Housing Authority, and Chicago Public Schools.

Fourteenth Amendment. The district court dismissed her amended complaint with prejudice. This appeal followed.

## II.    Discussion

"This court reviews de novo the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 535 (7th Cir. 2023). We take the facts in Martin's complaint "as true and view them in the light most favorable to [her]." *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 695 (7th Cir. 2021).

To sufficiently plead a procedural due process violation, a plaintiff must allege the "deprivation of a protected interest" and "insufficient procedural protections surrounding that deprivation." *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008). This appeal focuses on whether Martin has sufficiently alleged a deprivation of her occupational liberty rights under a "stigma-plus" theory of harm. *See Doe v. Purdue Univ.*, 928 F.3d 652, 661–62 (7th Cir. 2019).

A stigma-plus deprivation involves "an injury to [a plaintiff's] reputation" plus "a change in legal status." *Hinkle v. White*, 793 F.3d 764, 768 (7th Cir. 2015) (citation and internal quotation marks omitted) (explaining that a deprivation of occupational liberty constitutes a change of legal status). It requires Martin to show that "(1) the defendant[s] made stigmatizing comments about h[er]; (2) those comments were publicly disclosed; and (3) [s]he suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010) (citation omitted). We can resolve this appeal by answering whether Martin sufficiently pleaded a tangible loss, so we start there.

### A. Martin's Occupation

How we define Martin's occupation is central to answering whether she has pleaded a tangible loss of other employment opportunities. Defendants frame Martin's occupation broadly as encompassing the "elevator service and repair business." Martin, on the other hand, asks us to circumscribe her occupation to State- or City-facing elevator work due to the procurement policies favoring minority- and women-owned businesses.

The Fourteenth Amendment ensures a person's liberty "to pursue a calling or occupation, … not the right to a specific job." *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010) (citation and internal quotation marks omitted). "An occupation entails the performance of a discrete set of professional responsibilities that can be meaningfully distinguished from those of other occupations in a field." *Biggs v. Chi. Bd. of Educ.*, 82 F.4th 554, 561 (7th Cir. 2023). A job, on the other hand, encompasses work for "a *particular* employer or customer or at a *particular* level of prestige or authority." *Id.*; *see also Wroblewski v. City of Washburn*, 965 F.2d 452, 455–56 (7th Cir. 1992) (performing work at a city's marina is not an "occupation" that could establish a liberty deprivation).

To that end, we have explained that "being a police officer is an occupation," but holding a specific position within law enforcement management—such as Chief of Police or police lieutenant—is "a particular rank or job in the police force." *Hinkle*, 793 F.3d at 767 (citation and internal quotation marks omitted). Similarly, "being a psychologist is an occupation; being a member of a hospital's medical staff is not." *Ill. Psych. Ass'n v. Falk*, 818 F.2d 1337, 1344 (7th Cir. 1987). Still, the occupation-job distinction requires us to consider the nature of

any expertise or training required to pursue a chosen line of work. *Biggs*, 82 F.4th at 561. For instance, in *Biggs*, we elected to define a plaintiff's occupation as "school administration" instead of the broader "field of education" because the plaintiff "ha[d] obtained special education, training, and licensure in school administration." *Id.*

Martin's occupation is operating an elevator service and repair business. While the State and City have preferential procurement rules that favor her, *Biggs* makes clear that a plaintiff does not have a constitutional right to work for a particular customer or at "a particular level of prestige or authority." *Id.*; *see Chi. United Indus., Ltd. v. City of Chicago*, 669 F.3d 847, 849–51 (7th Cir. 2012) (rejecting stigma-plus claim brought by minority-owned business's principal owners who sought to utilize Chicago policies favorable to minority- and women-owned businesses).[2] Moreover, Martin never limited her work to solely State and City clients: Around 20 percent of Smart Elevators's business came from private clients even before OEIG's investigation began. We decline to limit her occupation as encompassing only elevator service and repair work with the State or City.

---

[2] In *Chicago United Industries, Ltd.*, we held that a minority business certification is a property interest that can lead to a viable due process claim when the government "de facto revo[kes]" the certification by "destroy[ing] [its] value." 669 F.3d at 851 (citation and internal quotation marks omitted). We explained that public entities may nonetheless "curtail [their] business with [a] company" when they have probable cause to believe the company violated the law. *Id.* at 851–52. Martin has not argued that the State or City effectively deprived her of her minority- or woman-owned business certifications, nor has she argued that the State or City's beliefs that she violated state law were groundless. *See id.* at 852.

### B. Loss of Employment Activities

We next consider whether Martin "suffered a tangible loss of other employment opportunities" because of the OEIG report. *Palka*, 623 F.3d at 454. For her claims to advance, she must show that her "good name, reputation, honor or integrity" were "called into question" in a sufficiently severe way so as to "make[] it virtually impossible for" her to run an elevator service and repair business. *Abcarian*, 617 F.3d at 941 (quoting *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001)). This standard presents a high bar: "[R]educed economic returns and diminished prestige" are insufficient to establish an occupational liberty deprivation absent "permanent exclusion from or protracted interruption of employment." *Chi. United*, 669 F.3d at 850.

Martin's biggest hurdle is that she still owns and operates Smart Elevators. Her "employment by the company was never interrupted[;] … [she] simply cannot have been denied h[er] liberty to pursue a particular occupation when [s]he admittedly continues to hold a job—the same job—in that very occupation." *Id.* at 851 (citing *Abcarian*, 617 F.3d at 941 ("[Plaintiff] cannot meet this burden for a simple and benign reason: [H]e still has his job in his chosen profession!")).

Martin sees things differently. Despite still being in business, she asserts that her exclusion from State and City contracts is sufficient to support her stigma-plus claim. True enough, the Supreme Court has indicated there may be a deprivation if a state defendant "invoke[d] … regulations to bar [a plaintiff] from all other public employment." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972). But Martin does not allege that the OEIG report itself explicitly bars her from any public employment, let alone all public employment. *See*

*Purdue Univ.*, 928 F.3d at 662–63 (holding that it was an "official determination of guilt, not the preceding charges or accompanying rumors, that allegedly deprived [plaintiff] of his occupational liberty"). To the extent she is effectively barred from contracting with certain State and City entities, she can still pursue other avenues of public employment with the federal government and other cities, municipalities, and counties. *See Webster v. Redmond*, 599 F.2d 793, 798 (7th Cir. 1979) (no deprivation where defendant's action did not "bar him from continued employment with the [Chicago Board of Education], let alone from the rest of the public educational system").

Indeed, as her complaint illustrates, the Department of Justice awarded Smart Elevators a contract in 2021, and, in 2019, the Department of the Navy ended a suspension it had placed on Martin and the company. Beyond federal contracts, Martin has also rebuilt Smart Elevators's business profile by expanding her already-existing private client base and providing services out-of-state. *See Wrobleski*, 965 F.2d at 455–56 (no deprivation even though plaintiff had to leave home state to find work). With no liberty deprivation, Martin cannot sustain a stigma-plus claim. The district court appropriately granted defendants' motion to dismiss.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's entry of judgment in favor of defendants.

EASTERBROOK, *Circuit Judge*, concurring. Suzy Martin contends that the Due Process Clause of the Fourteenth Amendment entitles her to notice and an opportunity for a hearing before being charged with a crime. My colleagues reply that her loss from the bribery-and-kickback charges—leveled by both a state inspector general and a federal grand jury—was not severe enough to activate a "stigma plus" escape hatch from *Paul v. Davis*, 424 U.S. 693 (1976), which holds that defamation generally does not violate the Due Process Clause. See also *Codd v. Velger*, 429 U.S. 624 (1977).

I do not disagree with my colleagues' analysis but think it unnecessary. A formal charge of crime need not be preceded by hearings. Instead a charge sets the stage for a hearing, such as the trial at which Martin was acquitted. The Constitution provides for notice and an opportunity for a hearing. The formal charge is notice, and the hearing follows.

Neither the inspector general's report nor the indictment prohibited any unit of federal, state, or local government from awarding a contract to Martin or her firm. The report and indictment accused her of bad conduct, to be sure, but that just put the process in motion. A hope to be awarded a contract is not a property interest for due process purposes, and a poor reputation is not a loss of liberty. The Constitution and federal statutes entitled Martin to a trial on the indictment, and statutes or rules may have entitled her to hearings before being debarred from doing business with particular agencies. See, e.g., 30 ILCS 500/50-65; Ill. Admin. Code Title 44 §4.5560; Chicago Board of Education Policy 401.6 (Debarment) §4.5. But nothing requires a pre-charge hearing.

Debarment is a legal inability to receive a contract; a legal disability differs from any agency's unwillingness to contract

with a particular person at a particular time. If ability to be considered for a contract (the absence of debarment) is a property interest, the Constitution may require the offer of a hearing. But it is the debarment that is the focus of the hearing. The model of notice and an opportunity to be heard supposes that the notice identifies a serious charge that warrants a hearing to determine its truth; for the hearing to precede the charge is to get things backward.

Think of the many charges that are made without opportunities for adversarial hearings. A civil complaint may allege grievous misconduct, and a credible allegation may injure the defendant's business prospects. If the EEOC accuses a firm of mistreating female workers, or the Department of Justice accuses a firm of violating the antitrust laws, millions of dollars in shareholders' equity may evaporate. Yet a pre-complaint hearing is unnecessary, and the complaint's allegations enjoy an absolute privilege against civil liability. *Restatement (Second) of Torts* §586.

An internal report at a college may charge a tenured teacher with sexual assault and propose that the teacher be fired. The FTC may file a complaint charging the respondent with defrauding thousands of consumers, and the SEC may file a complaint charging a broker with defrauding investors out of multiple millions. Investors will lose immediately. See Sam Peltzman, *The Effects of FTC Advertising Regulation*, 24 J.L. & Econ. 403 (1981). Yet the financial and reputational damage, and the need to pay lawyers to defend against the accusations, are not the sort of injury that occasion a judicial intervention. *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980).

An agency's inspector general or the Comptroller General may accuse a federal contractor of fraud or other misconduct.

A federal prosecutor may file a criminal complaint and call a press conference. A grand jury may return an indictment charging a defendant with a kickback scheme (as Martin was charged)—or with premeditated murder. These, and more, may cause reputational loss, but all the Constitution requires is an offer of a hearing before the final decision. A person taken into custody following a prosecutorial charge of felony gets a hearing within 48 hours, but a person charged in an indictment must wait for the trial. Compare *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), with *Gerstein v. Pugh*, 420 U.S. 103 (1975). See also Fed. R. Crim. P. 5.1(a)(2) (no preliminary hearing for an indicted defendant).

Martin's federal indictment was followed by a trial. That was the process due for a criminal charge, even though the indictment was issued *ex parte*. A proposal to debar Martin from doing business may have required a hearing as a matter of due process or state law. But a formal charge of criminal misconduct, whether by an inspector general or a grand jury, need not be preceded by an adversarial hearing just because the charge itself affects someone's reputation.

Today's decision resolves the issues as the parties presented them. That's appropriate, if not essential. See *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020). Still, by addressing the parties' dispute as they framed it, the court has not established that the parties framed it the right way. They did not.