In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-1769

PATRICK JONES JR.,

*Plaintiff-Appellant,*

*v.*

LAKE COUNTY SHERIFF'S OFFICE and LAWRENCE OLIVER,

*Defendants-Appellee*s.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-05798 — **Sharon Johnson Coleman**, *Judge.*

———————————

ARGUED DECEMBER 4, 2023 — DECIDED SEPTEMBER 30, 2025

———————————

Before ROVNER, SCUDDER, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* When Patrick Jones Jr. was in training to be a deputy sheriff, he offered to share what he thought was a study guide with his classmates in preparation for an upcoming test. As it turned out, the study guide was a cheat sheet for a prior version of the Illinois state law enforcement exam. After an investigation into allegations that he circulated answers to an upcoming exam, the Lake County Sheriff's Office ("Sheriff's Office") fired Jones. Undersheriff Lawrence

Oliver, the second-in-command at the Sheriff's Office, wrote Jones a termination letter outlining how Jones's behavior violated the Sheriff's Office's code of conduct. In response, Jones sued Undersheriff Oliver and the Sheriff's Office, alleging the letter was defamatory and deprived him of occupational liberty. The district court entered summary judgment for the Sheriff's Office and Undersheriff Oliver. We affirm.

## I.  BACKGROUND

In reviewing the entry of summary judgment, we recount the facts in the light most favorable to Jones, as the nonmoving party, and draw all reasonable inferences in his favor. *Biggs v. Chi. Bd. of Educ.*, 82 F.4th 554, 559 (7th Cir. 2023).

In September 2019, the Lake County Sheriff's Office hired Patrick Jones Jr. as a probationary deputy sheriff and sent him to the Police Training Institute to complete required law enforcement training.[1] An essential part of that training is preparing for a state exam, which recruits must pass to be certified as an Illinois law enforcement officer.

At the Police Training Institute, an instructor encouraged Jones to form a study group with other recruits and to share notes in preparation for the exam, which would be administered at the end of the course. Jones asked his girlfriend, who had recently graduated from another police academy, for her notes and study guides. She sent Jones a document entitled "State Exam Review 17-7.5" that contained a list of 195 numbered entries, mostly consisting of questions or phrases

---

[1] To become a certified law enforcement officer in Illinois, recruits must successfully complete a training course at a police academy approved by the Illinois Law Enforcement and Training Standards Board ("ETS").

followed by short answers. Here are three examples of the entries in this document:

- 1. Codeine with syrup? **Schedule 5**

- 25. Reasons for maintaining proper field notes? **All of the Above (Court Statements Think. Accuracy)**

- 60. **Brachial Stun** (was the right answer for stuns. Don't ask (-_-)[)].

Jones glanced at the document and thought it was a study guide. He did not realize the document had the questions and answers to an earlier version of the state law enforcement exam or that the document had been the subject of an earlier investigation by the Illinois Law Enforcement and Training Standards Board.[2]

The next day, Jones was sitting with several other recruits when one said she was nervous about an upcoming test (apparently, a precursor to the state exam). Jones told her he had a study guide for the state exam and offered to share it. But another recruit heard the conversation and told the Police Training Institute Jones said he had the answers to the state exam.

The Institute's assistant director, Joseph Gallo, investigated the allegation. He interviewed each recruit who had been sitting with Jones. Some recruits said Jones had mentioned he had a study guide, others relayed Jones said he had answers to the state exam. Gallo then interviewed Jones, who provided a copy of the document and said he thought it was

---

[2] The Illinois Law Enforcement and Training Standards Board is responsible for developing and administering the state law enforcement exam.

a study guide. Gallo noted that "[t]he material contained short numbered sentences, followed by an answer." Gallo had the entire class of recruits complete a questionnaire about the incident with Jones and report whether they had a copy of the purported study guide. Gallo also contacted the Illinois Law Enforcement and Training Standards Board about the document; the Board's investigators confirmed that the supposed study guide was a known cheat sheet.

Gallo prepared an investigation report, which he provided to the Lake County Sheriff's Office, summarizing his findings and recommending Jones be permitted to stay at the Police Training Institute. Gallo thought Jones was telling the truth because Jones "lacked the understanding to interpret" the document. Gallo took Jones at his word that he had only looked at the document briefly.

The Lake County Sheriff's Office disagreed and fired Jones on September 30, 2019. In a termination letter written by Undersheriff Oliver, the Sheriff's Office explained it was alarmed by Jones's efforts to provide other recruits a document that the Illinois Law Enforcement and Training Standards Board had previously identified as "a source of concern." Jones's willingness "to distribute that document to other recruits under the guise as a '*study guide*'" and his responses during the investigation demonstrated behavior that fell "short of the truthfulness and integrity that are essential to the core standard of values we hold ourselves accountable to in law enforcement." Undersheriff Oliver copied various officials within the Sheriff's Office, including the Lake County Sheriff's Office Merit Commission ("Merit Commission"), on the termination letter, but he did not distribute it to anyone else.

Jones soon began applying for a new law enforcement role. At Jones's request, during his job search, the Lake County Sheriff's Office let the Waukegan Police Department (Illinois) review his personnel file, including the termination letter. Jones had to tell other prospective employers that he had been fired and why, but there is no evidence these other prospective employers ever saw the letter itself. For example, Jones applied to the Des Plaines Police Department (Illinois) but did not receive an offer after he disclosed his previous termination and failed a polygraph test question about his prior use or sale of "any illegal narcotics or drugs."

After unsuccessfully applying to twenty-seven law enforcement agencies, the Kenosha County Sheriff's Department (Wisconsin) eventually hired Jones. He believes he had a tough time finding a new job as a law enforcement officer because of the termination letter and its references to his lack of integrity. In all, it took Jones a little under two years to find a new job in law enforcement.

After the Kenosha County Sheriff's Department hired Jones, he sought redress in federal court for his prolonged employment search. He brought two claims. First, he raised a federal claim against Undersheriff Oliver (in his personal capacity) and against the Sheriff's Office pursuant to 42 U.S.C. § 1983. Jones alleged the termination letter deprived him of occupational liberty in violation of the Due Process Clause of the Fourteenth Amendment. Second, he brought a claim of defamation *per se* as a matter of Illinois tort law against Undersheriff Oliver for penning the allegedly stigmatizing letter.

Following discovery, the district court entered summary judgment for the Sheriff's Office and Undersheriff Oliver. The court concluded Jones's occupational liberty claim failed

because he had not shown that it was "virtually impossible" to find new employment as a law enforcement officer. The court also held that Jones's defamation claim failed because he could not show that the termination letter was *per se* defamatory as the challenged statements were opinions based on true factual predicates. In addition, the district court found Jones's defamation claim failed because Undersheriff Oliver was entitled to absolute immunity as a matter of Illinois common law.

## II.  ANALYSIS

We take a fresh look at the district court's entry of summary judgment, meaning we assess for ourselves whether summary judgment is appropriate. *Biggs*, 82 F.4th at 559. Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it can "affect the outcome of the suit"; a dispute is genuine if there is sufficient evidence for "a reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When conducting our review, we interpret the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). What's more, we may affirm on any basis the record supports if the nonprevailing party had a fair opportunity to contest the issue. *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018).

### A. The Sheriff's Office is Not a Proper Defendant

We first consider whether the Lake County Sheriff's Office is a proper defendant. Section 1983 creates a remedy for those

whose constitutional rights are violated by any person acting under color of state law. In general, local branches of government are "persons" under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). In Illinois, a county's sheriff's office is a municipal entity and is, thus, amenable to suit under § 1983. *E.g., Daniel v. Cook County*, 833 F.3d 728, 737 (7th Cir. 2016). But a municipal entity is liable only for its own acts or omissions—there is no supervisory liability (in Latin, *respondeat superior*) in § 1983 cases. *Monell*, 436 U.S. at 691. The critical feature of *Monell* liability is that the plaintiff must have been harmed by a municipal policy or custom. *Id.*; *Gonzalez v. McHenry County*, 40 F.4th 824, 828–29 (7th Cir. 2022).

In reviewing the record, it appears Jones did not bring any *Monell* allegations in his amended complaint. The Lake County Sheriff's Office, therefore, could have been dismissed at the pleading stage. *See Gonzalez*, 40 F.4th at 830. Neither in the briefing nor at oral argument were the parties able to direct us to any evidence to support a *Monell* claim against the Sheriff's Office. *See Daniel*, 833 F.3d at 738 (describing the sort of evidence that can support a *Monell* claim sufficient to survive a motion for summary judgment). Indeed, at oral argument, Jones's counsel confirmed that Jones was fired "pursuant to no policy or custom."[3] That concession is fatal to his

---

[3] (Oral Arg. at 9:49–50). During oral argument, we were told that the Lake County Sheriff's Office was identified as a defendant solely for purposes of indemnity in the event of a judgment against Undersheriff Oliver. Yet, the possibility of a judgment against an employee of the Sheriff's Office, acting in his individual capacity, does not require joining collateral funding sources as defendants. *Askew v. Sheriff of Cook Cnty.*, 568 F.3d 632, 637 (7th Cir. 2009). Because Jones does not seek to hold the Sheriff's Office directly liable, it was not a proper defendant under this second theory either.

*Monell* claim. *See Monell*, 436 U.S. at 694. Accordingly, the district court properly entered summary judgment for the Sheriff's Office. *See Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (affirming summary judgment on a *Monell* claim because the plaintiff offered insufficient evidence to support it).

### B. Jones's Occupational Liberty Claim Against Undersheriff Oliver

Next, Jones insists that Undersheriff Oliver deprived him of occupational liberty. The Due Process Clause of the Fourteenth Amendment prohibits States from depriving a person of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1; *see Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972). Among the liberty interests vindicated by the Due Process Clause is the right to occupational liberty—the freedom to pursue "a trade, profession, or other calling." *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (quoting *Lawson v. Sheriff of Tippecanoe Cnty.*, 725 F.2d 1136, 1138 (7th Cir. 1984)).

A government employer may be held liable for infringing this liberty interest if it fails to provide constitutionally adequate process in two circumstances. A due process claim may arise when the state casts doubt on "the employee's 'good name, reputation, honor, or integrity,'" or when the state "imposes 'a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities.'" *Dunn v. Schmitz*, 70 F.4th 379, 382 (7th Cir. 2023) (alteration in

---

*See id.* We also note that because the issue of *Monell* liability has been ignored, we need not consider whether Undersheriff Oliver is a final decisionmaker such that his acts create liability for the Sheriff's Office. *See Pembauer v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986).

original) (quoting *Roth*, 408 U.S. at 573). Either way, to suc-
ceed on an occupational liberty claim, the employee must
prove three elements:

> (1) The employer, by word or action, stigmatized the em-
> ployee;

> (2) The stigmatic information was publicly disclosed; and

> (3) The employee suffered a tangible loss of other em-
> ployment opportunities because of the publicly dis-
> closed, stigmatizing information.

*Biggs*, 82 F.4th at 560 (citing *Palka v. Shelton*, 623 F.3d 447, 454
(7th Cir. 2010)).

Of these requirements, only the second and third are dis-
puted here. Although the district court understandably re-
solved Jones's claim by analyzing the third element, we re-
solve it on the second. Specifically, we answer the question
Jones mostly ignores in his opening brief: Was the termination
letter publicly disclosed by Undersheriff Oliver?[4] *Covell v.
Menkis*, 595 F.3d 673, 678 (7th Cir. 2010) (explaining that a de-
fendant cannot be liable for publicly disclosing stigmatizing
information if that defendant did not disclose it).

Proof of public disclosure is an essential requirement to
succeed on an occupational liberty claim. *Palka*, 623 F.3d at
454. Even if a public employer makes stigmatizing statements
about an employee, those statements could not have affected

---

[4] Because Jones's claim fails for other reasons, we do not address whether
a subordinate official acting in his individual capacity can be deemed to
have deprived another employee of occupational liberty. Ordinarily, the
stigmatized employee must show that the *employer* has deprived the em-
ployee of occupational liberty. *E.g.*, *Biggs*, 82 F.4th at 559.

the employee's job prospects unless the stigmatizing information is "disseminated … in a manner which would reach future … employers … or the community at large." *Ratliff v. City of Milwaukee*, 795 F.2d 612, 627 (7th Cir. 1986). By contrast, disclosure of stigmatizing information within "the proper chain of command," *id.*, or to a related entity that has its own "obligation of confidentiality," *Palka*, 623 F.3d at 454, is not a public disclosure. Moreover, a plaintiff cannot establish the public disclosure prong by self-defaming, *i.e.*, disclosing or publishing the stigmatizing information herself. *Olivieri v. Rodriguez*, 122 F.3d 406, 408–09 (7th Cir. 1997).

While we do not recognize self-defamation as satisfying the public disclosure element, we have determined that an employee need not show actual disclosure if it is *certain* that the employer will disclose the stigmatizing information; for instance, when the law requires the disclosure. *Dupuy v. Samuels*, 397 F.3d 493, 510 (7th Cir. 2005). In *Dupuy*, for example, an Illinois statute required plaintiffs who were subject to findings of child abuse or neglect to authorize the government to disclose that information when they applied for jobs in the field of childcare. *Id.* We held that the plaintiffs satisfied the disclosure element even though no actual transmission of the information had yet occurred because, by operation of state law, "dissemination was inevitable." *Dunn*, 70 F.4th at 383; *Dupuy*, 397 F.3d at 510. But we have since emphasized the narrowness of this rule, which requires more than a "mere likelihood" of public disclosure; rather, the plaintiff must show that such disclosure is actually required. *Dunn*, 70 F.4th at 384.

Jones has submitted no evidence that Undersheriff Oliver publicly disclosed the termination letter. After reviewing the record, we were able to identify one instance of the Lake

County Sheriff's Office disclosing Jones's personnel file, which included the termination letter, to a prospective employer—the Waukegan Police Department. Even so, Jones faces two serious problems. First, he authorized that disclosure. Specifically, Jones authorized the Lake County Sheriff's Office to provide his personnel file to the Waukegan Police Department, which contained the termination letter. Thus, he cannot now complain that the Sheriff's Office engaged in public dissemination when he consented to the disclosure. *See Olivieri*, 122 F.3d at 407–09 (rejecting the argument that "self-defamation" supports an occupational liberty claim). Second, Jones does not argue or point to evidence that Undersheriff Oliver played a role in providing his personnel file to the Waukegan Police Department. Jones needed to present facts that demonstrated Undersheriff Oliver's personal involvement in the disclosure to the Waukegan Police Department to have any chance of holding Undersheriff Oliver liable for it. *Covell*, 595 F.3d at 678.

When questioned at oral argument regarding any disclosures, Jones's counsel argued that the best evidence showing that the letter was disseminated outside of the personnel file was Undersheriff Oliver's transmission of the letter to the Lake County Sheriff's Office Merit Commission. Although Undersheriff Oliver sent the termination letter to the Merit Commission, we conclude that this was not a "public disclosure."

To understand why, it is helpful to explain the nature of the commission. Various counties in Illinois, including Lake County, have created a merit system under the Sheriff's Merit System Law. 55 ILL. COMP. STAT. 5/3-8002; LAKE COUNTY, ILL., CODE OF ORDINANCES § 31.065. The Lake County Sheriff's

Office Merit Commission is "an administrative agency" that is "independent of … the Sheriff['s]" Office. LAKE COUNTY SHERIFF'S OFFICE MERIT COMMISSION, RULES AND REGULATIONS § 1.5 (May 2018); *see also* LAKE COUNTY, ILL., CODE OF ORDINANCES § 31.065(B). It oversees the "employment and promotion," and "discipline or discharge" of deputy sheriffs. 55 ILL. COMP. STAT. 5/3-8007. It is, in essence, an independent body responsible for overseeing the certification of deputy sheriffs, ensuring their qualifications for appointment to that role, and is responsible for administering a range of disciplinary measures to ensure the integrity of the Lake County Sheriff's Office. *See generally*, LAKE COUNTY SHERIFF'S OFFICE MERIT COMMISSION, RULES AND REGULATIONS. Consequently, Illinois law requires that the Merit Commission "shall be promptly notif[ied] … of all … suspensions, resignations, or vacancies from any cause." 55 ILL. COMP. STAT. 5/3-8016. The Merit Commission is also entitled to "copies of all letters of … reprimand and such other reports as [it] may reasonably request." *Id.* The Lake County Sheriff's Office Merit Commission has adopted rules and regulations, *see id.* § 5/3-8009, that require keeping the Sheriff's Office personnel files confidential, *see* LAKE COUNTY SHERIFF'S OFFICE MERIT COMMISSION, RULES AND REGULATIONS § 3.2.

Given the Merit Commission's legal structure as, in essence, a supervisor of the Sheriff's Office's personnel, it is conceivable that the Merit Commission is properly understood to be within the chain of command at the Sheriff's Office so far as hiring and firing decisions are concerned. In that case, there would be no public disclosure. *Ratliff*, 795 F.2d at 627.

But we need not resolve that question because even if we consider the Merit Commission to be outside the "chain of

command," disclosure to the Merit Commission is not a "public disclosure." We have previously held that a Sheriff's Department's disclosure of stigmatizing information to a State's Attorney's Office did not count as public disclosure. *See Palka*, 623 F.3d at 454. The reason was that "[t]he State's Attorney's Office has an obligation of confidentiality." *Id.* So too here. The Lake County Sheriff's Office Merit Commission is a closely related, supervisory entity that "has an obligation of confidentiality, and there is no [evidence] that [the termination letter] reached potential future employers." *Id.* As a result, Undersheriff Oliver's disclosure of the termination letter to the Merit Commission was not a "public disclosure" sufficient to support an occupational liberty claim. *Id.*; *Ratliff*, 795 F.2d at 627.

Lastly, Jones suggests he was required to disclose his firing and the underlying reasons for it to potential future employers. This theory is defective. For one, Jones does not develop any compelled disclosure argument in his opening brief, so we could rightly consider the argument waived. *Bradley v. Vill. of Univ. Park*, 59 F.4th 887, 897 (7th Cir. 2023). For another, Jones points to no legal authority for the proposition that, "as a condition of employment," he must disclose the termination letter to prospective employers. *Dupuy*, 397 F.3d at 510 (emphasis omitted). In fact, we have rejected the idea that a fired police officer can show public disclosure just because prospective employers may ask why the officer was fired or even if it is "highly likely" the prospective employer will figure out the reason. *Olivieri*, 122 F.3d at 408. There is no claim for a deprivation of occupational liberty when—as here—the public disclosure element hinges on what amounts to "self-defamation." *Id.* at 408–09. In other words, Jones cannot show Undersheriff Oliver publicly disclosed the letter.

Because Jones cannot demonstrate that the termination letter was publicly disseminated, we need not resolve the parties' remaining disputes over the viability of Jones's occupational liberty claim.

**C. Jones's Defamation Claim Against Undersheriff Oliver**

Jones also brought a state law defamation claim against Undersheriff Oliver. Because we apply Illinois law, we must decide the case based on our prediction of how the Illinois Supreme Court would rule. *Community Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 811 (7th Cir. 2018). Like the district court, we conclude that absolute immunity—as a matter of Illinois common law—bars Jones's defamation claim.

In Illinois, a defamation claim requires evidence that the defendant made a false statement about the plaintiff, which the defendant published to a third party, and that damages resulted. *Krasinski v. United Parcel Serv., Inc.* 530 N.E.2d 468, 471 (Ill. 1988). A plaintiff need not prove damages, however, if the published statements are defamatory *per se*—meaning the statements are "obviously and naturally harmful" on their face. *Owen v. Carr*, 497 N.E.2d 1145, 1147 (Ill. 1986). Such statements, among others, include "words that impute a person is unable to perform or lacks integrity in performing his or her employment duties" or "words that impute a person lacks ability or otherwise prejudices that person in his or her profession." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009).

Even so, Illinois provides some public officials, as a matter of state common law, absolute immunity for "statements within the scope of their official duties." *Novoselsky v. Brown*, 822 F.3d 342, 349 (7th Cir. 2016) (citing *Geick v. Kay*, 603 N.E.2d

121, 127 (Ill. App. Ct. 1992)). That immunity extends to defamatory statements. *Id.* Absolute immunity in this context is sweeping: "The sole consideration is 'whether the statements were reasonably related to' the official's duties." *Novoselsky*, 822 F.3d at 350 (quoting *Geick*, 603 N.E.2d at 127–28). The Illinois Supreme Court has explained this "severe restriction" is "justified by the countervailing policy that officials of government should be free to exercise their duties without fear of potential civil liability." *Blair v. Walker*, 349 N.E.2d 385, 387 (Ill. 1976).

This form of absolute immunity protects "executive officials." *Novoselsky*, 822 F.3d at 350. Whether an undersheriff—the second-in-command in a sheriff's office—is an "executive official" appears to be an issue of first impression. But Illinois courts have extended absolute immunity to officials in similar and lower-ranking positions. *Dolatowski v. Life Printing & Pub. Co., Inc.*, 554 N.E.2d 692 (Ill. App. Ct. 1990) (deputy police superintendents); *Harris v. News-Sun*, 646 N.E.2d 8 (Ill. App. Ct. 1995) (police detectives); *see also Novoselsky*, 822 F.3d at 349–50 (holding that the Clerk of the Circuit Court of Cook County, Illinois is an executive official because "the clerk is an elected official who is the chief administrator of a local government office and is charged with a number of executive functions and duties" (citing 705 ILL. COMP. STAT. 105/13)). Given the state court decisions, and the lack of any contrary indication from the Illinois Supreme Court, *see Community Bank of Trenton*, 887 F.3d at 816, we conclude Illinois courts would extend absolute immunity to undersheriffs who make allegedly defamatory statements within the scope of their duties, *see Geick*, 603 N.E.2d at 127.

The only question remaining, then, is whether Undersheriff Oliver wrote the termination letter within the scope of his official duties. Jones does not argue that writing the termination letter was outside of Undersheriff Oliver's official duties, so he has waived any argument to the contrary. *Bradley*, 59 F.4th at 897. In any case, the record confirms hiring and firing decisions fall within Undersheriff Oliver's duties. The Lake County Sheriff, who has sole authority to terminate deputies during the first year of employment, can delegate those responsibilities to the undersheriff. 55 ILL. COMP. STAT. 5/3-6018, 3-6015, 3-8010. Undersheriff Oliver, along with the Sheriff and the chief of staff, collectively terminated Jones, and it was Undersheriff Oliver's duty to prepare the termination letter. Because preparing the termination letter was within the scope of Undersheriff Oliver's duties, this argument also fails.

Jones resists this conclusion by pointing to cases applying absolute immunity as a matter of federal law, not as a matter of Illinois common law. *See, e.g.*, *Auriemma v. Montgomery*, 860 F.2d 273, 275 (7th Cir. 1988). But those cases do not assist Jones here. His defamation claim is based on Illinois law, and "when state law creates a cause of action, the State is free to define the defenses to that claim, including the defense of immunity." *Ferri v. Ackerman*, 444 U.S. 193, 198 (1979); *see also* *Fields v. Wharrie*, 740 F.3d 1107, 1115 (7th Cir. 2014) (noting federal and state absolute immunity doctrines are not always coextensive); *Sullivan v. Freeman*, 944 F.2d 334, 337–38 (7th Cir. 1991) (evaluating absolute immunity as a matter of federal and Illinois state law). It is Illinois's prerogative to define the bounds of absolute immunity as a matter of state law for state tort claims. *Novoselsky*, 822 F.3d at 352. It is our duty "to apply Illinois law as it currently exists." *Id.*

We predict the Illinois Supreme Court would conclude that Illinois common law provides absolute immunity to Undersheriff Oliver because he is an executive official who acted within the scope of his duties. Accordingly, we need not reach the parties' arguments about the merits of Jones's defamation claim.

### III.  CONCLUSION

For these reasons, we AFFIRM the district court's entry of summary judgment for the Sheriff's Office and Undersheriff Oliver.